(No. 6407. May 17, 1937.)

RALPH E. BENNETT and MARY G. BENNETT, Respondents, v. R. C. DEATON and SUSSMAN WORMSER & COMPANY, a Corporation, Appellants.

[68 Pac. (2d) 895.]

Merrill & Merrill, for Appellants.

Anderson, Bowen & Anderson, for Respondents.

BUDGE, J.—Respondents brought this action against appellants for damages for the wrongful death of their minor son, Theo Bennett, and for hospital expenses, doctor bills, nurses' hire and burial expenses. The death was caused by the automobile driven by appellant R. C. Deaton, he then being in the course of his employment for appellant Sussman Wormser & Company, striking Theo Bennett on the highway between Salt Lake and Pocatello at a point about three-fourths of a mile north of Virginia, Idaho.

At or about the time and the scene of the collision appellant Deaton was driving his automobile on the easterly side, or his right side, of the highway in a northerly direction at a speed of about fifty miles per hour. One Edsel H. Christensen was traveling with a team and wagon on the westerly side and on his right side of the highway in a southerly direction. Several young boys from eight to thirteen years of age, among them Theo Bennett, coming from school diagonally crossed a field from the west and arrived on or near the highway and on the westerly side thereof at about the point where the Christensen team and wagon was traveling. The boys then continued walking in a northerly direc-

tion, not in a body, but at scattered intervals, Theo Bennett the deceased being alone. At about the time of, or shortly after, the passage of the Deaton automobile and the wagon of Christensen, Theo Bennett was struck by the automobile and thrown in the air or carried by the automobile approximately 145 feet away, alighting on the westerly edge of the hard surfaced portion of the highway. Weather conditions were good, the sun was shining and the view along the highway was unobstructed, there being no curves, trees, weeds, or anything upon or close to the highway excepting the automobile, the team and wagon, and the youthful pedestrians. The hard surface of the highway was eighteen feet in width and on either side was a hard and dry shoulder four to five feet in width. The wagon driven by Christensen was fitted with dump boards and was about four feet high over all, some twelve to fifteen inches less than the height of the deceased Theo Bennett. No one, except Mrs. Deaton, saw the youth at the instant he was struck; some other witnesses saw him immediately before the accident and others immediately afterward. Reference will be made hereafter to evidence with relation to the actual happening of the accident.

The cause was tried to the court and a jury and a verdict was returned against appellants for the sum of $10,375, and judgment was entered thereon. Appellants moved for a new trial, which motion was denied, and this appeal was then taken from the judgment and also from the order denying the motion for new trial.

Appellants in their brief have grouped for discussion their thirteen assignments of error, stating:

"In order to avoid repetition in covering the different Assignment of Errors, upon each of which we rely, we have grouped for discussion the assignments under the following headings: (1) Rulings on evidence, (2) Insufficiency of the evidence to support verdict, (3) That the release is a complete settlement and satisfaction, (4) Error in giving certain instructions, and refusing to give other instructions requested by the defendants."

In disposing of the errors assigned it would seem proper to first dispose of the point relied upon involving the question

of whether or not the release given by respondents to appellants was and is a complete settlement and satisfaction of their claim for damages sustained by. reason of the death of their son. If the release is a full settlement and satisfaction the court erred in refusing to grant a nonsuit or instructed verdict. Upon the other hand, if the release is voidable the court did not err in so holding and in refusing to grant the motion for nonsuit or instructed· verdict.

We are not unmindful of, and fully recognize the wisdom of, that rule which always inclines the courts to uphold and enforce the voluntary compromises and adjustments between parties of their legal differences, when fairly arrived at, and where the parties deliberately reach a compromise and settlement with full knowledge of all the facts.' What took place in connection with the alleged settlement, satisfaction and release of respondents' claim against appellants is not seriously in conflict although there is some conflict in the evidence touching certain conversations had. What took place may be summarized briefly as follows: The son of respondents met with a fatal accident on the afternoon of March 16, 1936, near 4:30 P. M. He was taken to a hospital in Pocatello and shortly after arriving at the hospital he died. On the same evening and shortly after the boy's death appellant Deaton went to the hospital where he had a conversation with the father of the boy. During the conversation Mr. Bennett stated to Deaton substantially that he was ''hard run,'' that he had a large family and asked Deaton if he could help him out, that he did not want the county to bury his boy and wanted him buried in fair circumstances. Mr. Deaton, in substance, replied that there was insurance on his car, which had sustained some damage, and that he could do nothing at that time but would think it over. On the following evening after the death of the boy appellant Deaton and one Mason, adjuster for the insurance company, went to the home of Mrs. Bennett's sister in Pocatello, where respondents were staying, and there for two and one-half hours carried on conversation and negotiation with respondents privately, upon Mason's and Deaton's request that the Bennetts should carry on their negotiations in the matter of compromising and settling with them privately.

We will not undertake to recite all that was said by appellants and respondents as shown by the transcript. Respondents expressed a desire to wait until after the Coroner's inquest, different reasons being given for making the request. Appellants on the other hand were urging immediate settlement. It appears that Mr. Mason, the adjuster, advised respondents he had investigated and adjusted many cases and had become familiar with the law of accidents and insurance. Respondents were advised that certain officers, including the state traffic officer had made statements that Mr. Deaton was not to blame and that appellants were merely offering to make a gift to help bury the boy, and advised respondents there was no liability. The father of the boy requested that they wait until he could get some legal advice, but was advised that they, the respondents, did not need any more advice, that appellants were just offering to do this under the circumstances and that if they did not take what they were offering they would get nothing. Mrs. Bennett told Mason and Deaton she could not stand to talk about it, that she was almost ''to the end of her rope'' and almost ''wild,'' and asked them if they would not leave. Mason and Deaton remained as above stated for two and one-half hours and repeatedly informed respondents that they could take the hospital and burial expenses or nothing. Mrs. Bennett testified that at the time she would have signed anything to get rid of Mason and Deaton, that she was so nervous and upset she would really have signed her life away to have gotten rid of them. That respondents believed and relied on what was said to them by Mason and Deaton and acted upon their statements would seem to be clearly established.

There are authorities which hold that alleged compromises may be avoided because of a mistake of law brought about by the instrumentality of the opposite party and that a mutual mistake either of law or of fact is sufficient to avoid a release. (Note to *Kiefer Oil etc. Co. v. McDougal,* Ann. Cas. 1916D, 347, at 349.)

As a general rule it is held that the question of whether or not fraud was practiced in obtaining a release by representations of nonliability is one of fact for the jury. (Note to *Madison Trust Co. v. Helleckson,* 96 A. L. R. 992,

at 1013.) It was for the jury to determine whether or not Deaton and Mason in making the statements they did to respondents were truthful and whether they had done all they represented to have done, covered by proper instructions. Whether by reason of the fact that respondents were, at the time that these negotiations were had, in such a state of mental distress and financial embarrassment, being constantly reminded of the fact that they could accept what was offered or that they would get nothing, the further thought that was impressed upon their minds by repeated statements made by Mason that there was no liability, that officers who had investigated, including the traffic officer had made statements that Deaton was not to blame and that the accident was solely and entirely due to the negligence of the deceased boy, created such a situation that respondents were overreached, unduly persuaded and, literally, because of their impecunious situation and distress of mind and body, subjected to the perpetration of a fraud that would vitiate the release was a question properly submitted to the jury for their determination. As was said in *Pacific Gas & Elec. Co. v. Almanzo,* 22 Ariz. 431, 198 Pac. 457:

"It is not within the province of this court to say whether these statements were or were not made; that was purely a question of fact for the jury under the evidence submitted. It can only be determined by us whether they are such that one might reasonably infer from them, taking into consideration all the circumstances surrounding their utterance, that it was intended by the one who used them that they should carry to the persons to whom they were spoken the weight of facts, and not be regarded merely as the expression of an opinion. . . . .

"We think that the Supreme Court of Oregon, in the case of *Woods v. Wikstrom,* 67 Or. 581, 135 Pac. 192, correctly states the law in a situation of this kind in the following language, to-wit:

" 'If the defendant represented to the plaintiff, in order to prevail on him to execute the release, that the accident was unavoidable, and that he had no cause of action against him, without believing said representations to be true, and the plaintiff believed said representations, and, so believing

executed the release, such representations constituted fraud and vitiated said release, if the representations were false.'

"We are clearly of the opinion that the evidence on the question of fraud is such that the court would not have been justified in refusing to submit the case to the jury as requested by appellant."

See, also, *Western Maryland Dairy Corp. v. Brown,* 169 Md. 257, 181 Atl. 468; *Carr v. Sacramento Clay Products Co.,* 35 Cal. App. 439, 170 Pac. 446; *Woods v. Wikstrom,* 67 Or. 581, 135 Pac. 192; *Madison Trust Co. v. Helleckson,* 216 Wis. 443, 257 N. W. 691, 96 A. L. R. 992, at p. 996.

When Mason made the statements that he had made a thorough investigation of all the facts before seeing respondents; that he had determined there was no liability; that he had adjusted on the average of one hundred claims a month; that he had become familiar with the law of accidents and insurance in his eight years of adjustments and investigations; that Deaton was not to blame for the accident and finally advised respondents they could accept the $375 or that they would get nothing; such statements and representations were calculated to induce reasonable persons, situate in the position and circumstance of respondents, to believe and act upon them. And if so believing and relying on such statements and representations, respondents executed the release here in question, it may be avoided for having been procured through fraud and misrepresentation. Keeping in mind the above briefly stated evidence we are of the opinion that the court would not have been justified in refusing to submit this phase of the case to the jury.

From what has been said with reference to the granting of a nonsuit or instructed verdict it follows that assignments of error numbered 1 and 2, attacking the court's ruling in permitting respondent to answer as to whether he had believed and relied upon the statements that were made by Mr. Mason and Mr. Deaton, are without merit, it being appellants' contention that such evidence was immaterial and irrelevant because none of the statements were shown to have been misleading, false, or deceptive.

We come now to the point urged that the evidence is insufficient to support the verdict. Appellants' contention

is that there is no evidence that any negligence upon behalf of appellant Deaton was the proximate cause of the accident and that the evidence shows that the accident was caused or contributed to by the negligence of the deceased. The evidence with relation to the manner in which, and the place at which, the deceased was struck is much in conflict. Testimony of various witnesses with relation to events immediately preceding the collision is not in accord, testimony of various witnesses being as follows:

Edsel H. Christensen:

"Q. Now, when the boys came up to the highway and met you, on which side of your wagon did Theo Bennett pass?

"A. Passed over on the left, to my left, on the east of the highway.

"Q. How did he pass, ahead of your team or back of your team?

"A. Ahead of the team; he crossed over in front of them.

"Q. How did the other boys pass you?

"A. They passed on the left,—or on my right. The other boys were on the west side of the highway.

"Q. Was Theo Bennett the only boy that crossed the highway to the east?

"A. Yes.

"A. . . . . We had passed about a rod when the boy was hit.

"Q. You mean north of the back end of the wagon?

"A. The back end of the wagon; yes.

. . . . . . . . . . . . . .

"A. . . . . I looked over my shoulder to see what was wrong and I saw the boy in the air.

"Q. Where did the boy lay after he was struck?

"A. Laid over on the west of the highway right on the edge of the tar,—the concrete."

Claire Bennett:

"Q. Where was Theo the last time you saw him before he was struck by the car?

"A. On the east side of the road.

"Q. And where were you at that time?

"A. On the east side of the road about three hundred steps from there. . . . .

"Q. At the time you were about three hundred steps to the south did any automobile pass you?

"A. Yes.

"Q. And was that at the same time you saw Theo, or about the same time?

"A. Yes."

Thos. Bennett:

"Q. . . . . Where did Theo go?

"A. He came around on the West side of the wagon and come up behind it and took hold of the endgate.

"Q. Did Theo Bennett go across the street in front of the horses to the east?

"A. No.

"Q. What was he doing, if anything, with the cap of any of you boys?

"A. He just took it and stuck it in his coat.

"Q. Where were you boys when he did that?

"A. In the field.

"Q. And then what did Theo do?

"A. . . . . when we got in the borrow pit he went ahead of us, walked around hooked on the back of the wagon, and we went down and stood on the cross road that comes up through . . . . and then he told Steed he was going to put his cap in the wagon. . . . .

"Q. Then what happened?

"A. Then I just got turned around and 'bang.'

"Q. Was that when the car hit Theo?

"A. Yes, sir.

"Q. Where was Theo right at that time, just before the last time you saw him?

"A. Behind the wagon.

"Q. And had Theo at any time been over on the east side of the road?

"A. No."

Lynn Bowman:

"A. Just no more than got hold of the endgate two or three seconds and he was hit.

"Q. Did you see him get hit?

"A. No.

. . . . . . . . . . . . . . .

"Q. Was Theo ever over on the east side of the road, Lynn?

"A. No."

Mrs. R. C. Deaton:

"Q. Will you now describe just how the accident occurred, Mrs. Deaton?

"A. Well, the boys were in back of the wagon, and just at the instant that we passed the back of the wagon Theo came with his back toward us, running onto the road and hit the left fender of our car.

"Q. In which direction was Theo running?

"A. Well, backwards, toward the south, in a southerly,— we were going north, and he backed rather to the south as we came around the end of the wagon."

R. C. Deaton:

"Q. Now, what happened as you came up the highway, Mr. Deaton?

"A. Well, the first thing that happened in connection with the accident was just as we were passing the wagon, the first thing I knew some object hit my car, . . . .

"Q. Did you keep a lookout along the side of the road, too?

"A. I don't make it a practice of looking alongside of the road. Naturally, I think everyone observes things with the sight of the eyes, but I generally look straight ahead.

. . . . . . . . . . . . . . .

"Q. You don't remember whether you kept a lookout any distance at all along the side of the road?

"A. Not definitely, no, sir.

"Q. You say 'not definitely.' Did you in any way?

"A. No.

"Q. Now, how far was this bend in the road from where you met the team and where the boy was killed?

"A. It seems to me about a quarter of a mile; . . . .

"Q. When you were on this bend, Mr. Deaton, could you see the team?

"A. Yes, sir.

"Q. That team was headed south?

"A. Yes, sir.

"Q. And two of the wheels were off the pavement? That is right, isn't it?

"A. To the best of my knowledge. . . . .

"Q. Yes. Did you see the two Bennett Boys that were south of the team on the east shoulder of the highway?

"A. No, sir.

"Q. Did you see any boys in the borrow pit, as you approached, west of the horses, the team and horses?

"A. No, sir.

"Q. Did you see any boys north of the horses, or the team, north of the Burton road, or the road that intersects there at the Burton home . . . . before the impact?

"A. No sir.

"Q. And the first time you saw Theo Bennett was after you had struck him?

"A. Yes, sir.

"A. . . . . the first I saw of the boy was when he hit the front fender.

"Q. Did you see the two Bennett boys who were south of the team down the highway on the east side of the road on the shoulder?

"A. I didn't see any boys until after we passed the wagon."

From the foregoing evidence it would appear that it might well be determined that the collision occurred in one of at least three ways. First, from the evidence of Christensen, it might be determined that deceased was struck on the easterly shoulder of the road; second, it might be determined that deceased was struck while crossing the highway from the easterly shoulder to the west side; and third that the deceased was struck in the manner as testified to by Mrs. Deaton, namely that the deceased backed out running back-

wards diagonally across the highway and to the south, with his back to the car, as the Deaton automobile was going north and past the back end of the wagon. As to the first two possibilities above suggested there was evidence to support a finding by the jury of negligence on the part of appellant, Deaton,—the speed at which he was driving, the fact that he did not see the boy or any of the boys, other boys being on the highway still further north and some being in the borrow-pit on the side of the highway, until after striking the deceased with the left front of the car, the fact that the evidence disclosed no obstruction of vision which would have interfered with seeing the deceased and at least some of the other boys under such circumstances, and the fact that no warning, of the horn or otherwise, was given. There is little if any evidence of contributory negligence on the part of deceased with relation to these first two possibilities. As to the third possibility as disclosed by the record it may be conceded that the question of contributory negligence on the part of deceased was presented. There was also evidence on certain features which the jury could have legitimately found amounted to negligence on the part of appellant Deaton. Among other things it appears that appellant Deaton was driving at a rate of speed in excess of what is termed by the statute (I. C. A., sec. 48–504) *"prima facie* lawful" (*Hurzon v. Schmitz,* 262 Ill. App. 337; *Morrison v. Flowers,* 308 Ill. 189, 139 N. E. 10; *Peperone v. Lee,* (La.) 160 So. 467; *Towle v. Maurin,* (Mass.) 4 N. E. (2d) 348), no warning signal was given (*Romano v. Short Line Stage Co.,* 142 Wash. 419, 253 Pac. 657; *Nunnelley v. Muth,* 195 Ky. 352, 242 S. W. 622, 27 A. L. R. 910; *Akers v. Fulkerson,* 153 Ky. 228, 154 S. W. 1101; *Metts v. Louisville Gas & Elec. Co.,* 222 Ky. 551, 1 S. W. (2d) 985). Appellant Deaton did not see prior to the collision either the deceased or any of the boys, yet from the evidence it would appear that at least some of the boys were on or immediately adjacent to the highway in such positions that they were visible to appellant Deaton had he looked (*Hornbuckle v. McCarty,* 295 Mo. 162, 243 S. W. 327, 25 A. L. R. 1508; *Martin v. Parkins,* 55 N. D. 339, 213 N. W. 574; *Autio v. Miller,* 92 Mont. 150, 11 Pac. (2d) 1039; *Moreau v. Southern Bell Tel. & Tel. Co.,* (La. App.)

158 So. 412; *Dobson-Peacock v. Curtis,* 166 Va. 550, 186 S. E. 13; *Texas Motor Coaches v. Palmer,* (Tex. Civ. App.) 97 S. W. (2d) 253; 5–6 Huddy, Ency. of Automobile Law, p. 73; *Ratcliffe v. Speith,* ·95 Kan. 823, 149 Pac. 740; *Routh v. Weakley,* 97 Kan. 74, 154 Pac. 218; *Schierhold ·v. North Beach & M. R. R. Co.,* 40 Cal. 447; *Prato v. Snyder,* 12 Cal. App. (2d) 88, 55 Pac. (2d) 255). It also appears that the appellant Deaton was driving on his extreme right of the pavement and that the team and wagon was on the opposite side and with the two right wheels off the pavement, leaving a considerable distance between the inside of the wagon and the inside of the automobile as they approached and passed, the paved portion of the highway being 18 feet wide, and the hard shoulders 4 to 5 feet wide each. It appears from Mrs. Deaton's testimony that deceased came from the back of the wagon and ran backwards diagonally to the south and was struck. From this testimony it appears there was considerable intervening space between the automobile and wagon, which distance deceased must necessarily have traveled to arrive in front of the left front of the automobile and that the length of time necessary for deceased to travel, running backward, was increased by reason of the fact that he moved not straight across the highway but to the south in prolongation of the highway and on the diagonal. While the boy was traveling this considerable distance in the view of the driver of the approaching car, the car traveled many feet, appellant Deaton did not see him, gave no warning signal, and did not turn out or vary his course. From such facts the jury might well' have found that had appellant seen what he should have seen, had he turned out to avoid the boy, had he given a warning signal, and had he been traveling at a lesser or lawful rate of speed, or had a combination of these elements existed, the accident would not have occurred. The question of defendant's negligence and the contributory negligence of a child is generally a question for the jury. (*Scott v. Kansas State Fair Assn.,·* 102 Kan. 653, 171 Pac. 634; *Dervin v. Frenier,* 91 Vt. 398, 100 Atl. 760; note to 65 A. L. R. 192; *Di Domenico v. Fluck,* 317 Pa. 385, 176 Atl. 210; *Koelling v. Union Fuel & Ice Co.,* (Mo. App.) 267 S. W. 34; *Morel v. Lee,* 182 Ark. 985, 33 S. W.

(2d) 1110; *Moser v. Hand,* 81 Fed. (2d) 522.)   Where the
minds of reasonable men might differ, or where different con-
clusions might be reached by different minds, the question
as to the existence of negligence and contributory negligence,
are questions for the jury (*Fleenor v. Oregon Short Line
R. R. Co.,* 16 Ida. 781, 102 Pac. 897; *Carr v. Wallace Laundry
Co.,* 31 Ida. 266, 170 Pac. 107), and only becomes a question
of law, authorizing a nonsuit or instructed verdict when the
evidence is susceptible of no other reasonable interpretation
than that the conduct of the injured party contributed to
his injury, and that, because of his negligence and careless-
ness, he did not act as a reasonably prudent person would
have acted under the circumstances. (*Donovan v. Boise
City,* 31 Ida. 324, 171 Pac. 670; *Williamson v. Neitzel,* 45
Ida. 39, 260 Pac. 689.)   We find no error in the action of
the court in submitting the questions of negligence and con-
tributory negligence to the jury.

▮▮▮▮▮▮ Appellant complains further of the giving of
certain instructions and the refusal to give certain requested
instructions.   It is urged that a portion of Instruction No.
14[1] is erroneous and is in conflict with instructions number 8,[2]

---

[1]"You are instructed that the defendants in this case contend
that the deceased, Theo Bennett, suddenly and without warning
appeared in the path of the approaching automobile, driven by the
defendant Deaton.   This is known in the law as the doctrine of
sudden appearance, on the part of a pedestrian.   This general doc-
trine of nonliability, where a pedestrian appears suddenly in front
of an automobile, necessarily implies that the operator of a machine
has been guilty of no preexisting negligence which contributed
to the injury and made it impossible to avoid the accident after
seeing the child.   Thus, if one is running his automobile at a speed
in excess of the statutory limit, or of a reasonable rate, he cannot
escape liability because a child ran in front of the automobile so
suddenly that the accident then was unavoidable; . . . . "

[2]"You are further instructed, gentlemen of the jury, that before
the plaintiffs can recover in this case, they must prove by a pre-
ponderance of the evidence that the defendant R. C. Deaton was
guilty of negligence, and in addition thereto they must prove by such
preponderance of the evidence that such negligence was the proxi-
mate cause of the death of said Theo Bennett the son of the plaintiffs.

"In this connection you are advised that the proximate cause of
an injury is that cause which is the natural and continuous sequence,

11,[3] and 21.[4]   It is a familiar rule that instructions must be·read and considered together, and the jury was so instructed in this case.   It would appear that when instruction 14 is considered with the other instructions given it is not susceptible to the interpretation that it instructs the jury that regardless of the negligence of the child, still the defendant could not escape liability if he was exceeding the statutory speed limit.

Instruction number 11, urged by appellants to be in direct conflict with instruction number 14, was given at appellants' request, and appellants are in no position to complain that it conflicts with instruction number 14.   (*Yontz v. Sherman*, (Mo. App.) 94 S. W. (2d) 917.)

unbroken by any efficient intervening cause producing the injury, and without which the result would not have occurred.   It is the efficient cause."

[3]"You are instructed, Gentlemen of the Jury, that if you find from the evidence that Theo Bennett moved or darted from behind the wagon driven by Mr. Christensen in front of the automobile driven by the defendant Deaton, just before or as he passed the wagon and that the accident would have happened even though Mr. Deaton had been driving at thirty-five miles per hour or less, then even though you find that Mr. Deaton was driving in excess of thirty-five miles per hour, the speed at which he was driving could not have been the proximate cause of the accident."

[4]"You are instructed, gentlemen of the jury, that this is an action for negligence against which the defendants defend upon the ground that they were not negligent, and by way of affirmative defense, upon the further ground of contributory negligence on the part of the deceased, Theo Bennett, son of the plaintiffs.

"In considering this case you should first concern yourselves with determining whether or not the defendant R. C. Deaton has been guilty of negligence, which was the proximate cause of the death of the said Theo R. Bennett, son of the plaintiff, and if you do not find that the plaintiffs have proven such negligence by a preponderance .of the evidence, then you should find for the defendants without further consideration of the matter.

"If you find, however, the existence of such negligence as aforesaid on the part of the defendants, or either of them, which was the proximate cause of the death of said Theo Bennett, son of the plaintiffs, then your verdict should be for the plaintiffs, unless you find that the death of said Theo Bennett was contributed to by the negli-

Appellants assign as error the giving of instruction number 13,[5] urging that it does not take into consideration any particular kind of highway or thoroughfare, and places a burden upon all motorists upon all highways. It appears the criticism urged is that motorists should be subjected to such burden only at points, or on highways where there are or are likely to be children. In view of the evidence in this case,—that there were numerous boys (children) on or immediately adjacent to the highway, and that the evidence further, without conflict shows that some at least were visible to the driver of the approaching automobile,—there would appear to be no prejudicial error in this instruction.

We have carefully examined instructions 15 and 19 urged to be erroneous, these instructions relating to the question of fraud, false representations or mutual mistake of a material fact, as vitiating the release or compromise, and they appear to conform to our conclusions heretofore reached with reference to such issues.

The instructions given by the court fairly covered the issues involved and there was no error in the court's refusal to give the instructions requested by appellants.

The judgment is affirmed. Costs awarded to respondents.

Morgan, C. J., and Holden, Ailshie and Givens, JJ., concur.

gence of said Theo Bennett, and that such alleged contributory negligence of said Theo Bennett has a causal connection with his death. . . . . "

[5]"You are instructed, gentlemen of the jury, that it is a matter of common knowledge that children may at unexpected moments run upon or across the part of the thoroughfares used for vehicles. The use of such thoroughfares by such children, motorists must be assumed to have knowledge of, and where their presence can be observed, a degree of care commensurate with the ordinary emergencies presented in these instances must be exercised. One driving a vehicle must not assume that children of immature years will exercise the care required for their protection and will not expose themselves to danger."