(No. 6823. January 24, 1941.)

REX BROWN and CLARA BROWN, husband and wife, Respondents, v. ROBERT H. GRAHAM and CLIFFORD HARRIS, Appellants.

[112 Pac. (2d) 485.]

ON REHEARING APRIL 29, 1941

390

H. J. Hull, for Appellants.

T. P. Wormward, Chas. E. Horning and F. C. Keane, for Respondents.

MORGAN, J.—This action was commenced by respondents against appellants to recover damages for the death of their daughter, Joyce Brown, between seven and eight

years old, caused by the alleged negligence of appellant Harris. May 5, 1937, a few minutes before seven o'clock p. m., Harris, in the discharge of his duties to appellant Graham, his employer, was driving a truck, loaded with gasoline and oil, in a westerly direction along Cameron Avenue, which is a part of Highway No. 10, through Kellogg, in Shoshone County. In crossing Division Street, which runs north and south and intersects the highway in Kellogg, the truck struck and killed Joyce Brown, in the pedestrian lane along the west side of said street.

On the evening in question there was to be a show, of interest to children, at the Rena Theater, located on the west side of Division Street about fifty feet north of the highway. Doris Brown, ten years old at the time of the accident, testified she and her sister, Joyce, started northward from their home, along Division Street, to attend the show; that they walked along the street until they came to the intersection of it with the highway; that she was holding Joyce's hand, and they stopped before entering the intersection, looked both ways along the highway, and started to cross it; that she did not see the truck before starting across; that she first saw it when it was entering the intersection and at that time she and Joyce were about the middle of the highway; that she stepped back and tried to pull Joyce back, but her sister jerked away from her and started to run on and the truck hit her. She testified:

"Q. How close to you did that truck come?
"A. Just a step";

also that the last she saw of Joyce she was "on the other side." She further testified:

"Q. Then you didn't see the truck actually strike her, did you? The truck was between you and Joyce when the accident happened, wasn't it?
"A. Yes.
"Q. So you didn't see the actual impact, did you?
"A. What do you mean?
"Q. I mean the actual blow of the truck striking her?
"A. No."

The testimony of two boys, Lawrence Shoemaker and

Max White, shows they were walking along the sidewalk, on the west side of Division Street, on the way to the show, when Doris and Joyce passed them. The girls continued to walk ahead of them to the intersection of the highway and Division Street. When the boys reached the slope or curb, at the south side of the highway, the girls were at, or near, the center of it, and the truck was entering the intersection from the eastward. At about the time the truck reached them Doris stepped back and Joyce jerked away from her and ran across in front of the truck toward the north side of the highway; that she got over to the right hand side of the truck before she was struck; that they did not see the truck strike her.

Jean Scrafford testified that just prior to the accident she was standing north and west of the highway, at its intersection with Division Steet, on the corner south of the Rena Theater; that she saw the truck approach the intersection from the east and saw Doris and Joyce Brown walking across the highway as the truck entered the intersection. She testified:

"Q. Now, were you able to observe what part of the truck hit Joyce?

"A. I know it was the right side, but which wheel hit her I do not know."

She further testified she did not actually see the impact when Joyce was struck; that, after the truck had passed, Joyce's body lay about two feet from the curb, just in front of where she, the witness, was standing.

Appellant Harris, called on behalf of himself and his co-defendant, testified he was traveling in a westerly direction along Highway No. 10, with his truck loaded with gasoline and oil, intending to make a delivery at Smelterville; that, as he approached the intersection of the highway and Division Street, he saw people standing at all corners of it. He further testified:

"Q. Tell us what you observed or who you observed, if anyone, at that time?

"A. You mean as I entered the intersection?

"Q. As you entered the intersection?

"A. Well, there were some grown-ups standing on the curb and just as I entered the intersection a small girl

dashed through those standing on the curb and came into sight.

"Q. Now, who was that, if you know?

"A. It was Doris Brown.

"Q. Doris Brown?

"A. Yes.

"Q. Who, if anyone, was with her, if you know?

"A. Well, I did not see anyone.

"Q. At that time?

"A. Not at that time.

"Q. Now, where were you when you first saw Doris Brown dash through the crowd at the corner there?

"A. Just entering the intersection.

"Q. That is the east side?

"A. The easterly side, yes.

"Q. All right. Now will you describe just what occurred as you caught that glimpse?

"A. Well, as I entered the intersection, that easterly pedestrian lane, I saw Doris dash through the crowd and step off the curb and then I met a car. Of course, my truck was going on and I met a car in the middle of the intersection and when I next caught sight of the girl I saw that there were two of them, a girl smaller than the one, and by that time my front wheels were nearly into the westerly pedestrian lane.

"Q. And where were the girls?

"A. They had just started away from the curb and probably four or five feet out, away from the curb.

"Q. All right. Go ahead and tell what occurred?

"A. Then the smaller girl pulled on ahead of her sister and her sister tried to pull her back or hold her back but she resisted and pulled away from her, and by the time the cab was over the pedestrian lane she pulled away from her and dashed off into the street and she came right at the side of the truck and hit it about the door and that is the last I saw of her.

"Q. What did you next notice or observe?

"A. Well, I felt a slight jolt and stopped.

"Q. What was the jolt, if you know?

"A. Well—

"Q. And what part of the car?

"A. It was the rear, the left rear wheel.

"Q. The left rear wheel?

"A. Caught the jolt.

"Q. And when you felt the jolt, what did you do?

"A. I brought the truck down and stopped.

"Q. And then what did you do?

"A. I got out of the truck and saw that she was lying in the street and I ran back.

"Q. All right. Before you get to that, what did you do with the truck at that time?

"A. I pulled it off into the gravel on the edge of the highway there and stopped.

"Q. Then what did you do?

"A. I got out and ran back and on the way back I yelled at the service station attendant over at the Yellowstone Garage to get an ambulance and a doctor, and then I went on to where she was lying in the street."

The record shows Harris did not sound his horn, or otherwise warn the children of the approach of the truck, nor did he apply his brakes until after the accident. His testimony about meeting a car is uncorroborated, and the witnesses to the tragedy, who were asked if the truck met a car in the intersection, testified they did not see it.

Harris further testified:

"A. It was, I guess, approximately ten or fifteen minutes. Mrs. Cunningham came down and was talking and we were looking the truck over for possible evidence of where it could have hit her.

"Q. All right. What did you observe, if anything, on the truck at that time?

"A. Well, there was some hand prints, on the left hand door.

"Q. What character of prints?

"A. Long drawn prints like a finger.

"Q. No other mark?

"A. Well, it was kind of scratched up there like.

"Q. Now, then, you say these marks were on the cab door?"

"A. Yes.

"Q. And on which side of the cab?

"A. On the left hand side, the driver's side."

His testimony with respect to the marks on the door is corroborated by that of other witnesses.

Elmer Carlson, a witness called on behalf of appellants, testified he was standing in the show room of the Yellowstone Garage, which was located just southwest of the intersection of the streets in question; that he was facing east and heard a scream; that he turned his head and looked to the north and saw the left rear wheel of the truck passing over the child's head.

There is conflict in the evidence as to the speed the truck was traveling just before and at the time of the accident; also as to the position of the child's body on the street immediately after the accident.

The trial resulted in a verdict and judgment for plaintiffs. Defendants moved for a new trial, and their motion was overruled. The case is here on appeal from the judgment and from the order overruling the motion for a new trial.

A witness, called by appellants, was asked, on direct examination, "What, if anything, did you observe about the speed of the truck at the time you observed it enter the intersection?" He answered : "There was nothing unusual about the truck." Counsel for respondents moved to strike the answer on the ground it was not responsive to the question. The motion was sustained, and the ruling is assigned as error. The answer was not responsive. The ruling was correct.

It appears from the record counsel for respondents had, prior to the trial, procured a statement from one of appellants' witnesses, in the presence of a stenographer, relative to what occurred at the time of the accident, and the stenographer had reduced the statement to writing. While the witness was on the stand, the following occurred with respect to that incident:

MR. HULL (of counsel for appellants) : "Your Honor, we are entitled to know the circumstances in which counsel went out with a stenographer and got a statement without furnishing a copy.

MR. KEANE (of counsel for respondents) : "Since when are we required to furnish a copy? That is plain,

unadulterated pettyfogging. We don't do it; they don't do it; insurance adjusters don't do it; nobody does.

MR. HULL: "I ask counsel's remarks be stricken from the record and the jury be instructed to disregard it.

THE COURT: "As I instructed you before, you will disregard any remarks of counsel."

Subsequently counsel for appellants, in the absence of the jury, moved for a mistrial, "on the ground that counsel has wrongfully and with deliberate purpose of creating prejudice in the minds of the jury, referred to insurance adjusters and thereby prejudiced the jury against these defendants." The motion was overruled, and the ruling is assigned as error.

■ There was nothing in the remark of respondents' counsel from which it could be inferred, reasonably, he was attempting to inform the jury appellants carried indemnity insurance protecting them from liability for the accident under consideration. The remark was not prejudicial and the ruling on the motion was not erroneous. (*Curtis v. Ficken*, 52 Ida. 426, 16 Pac. (2d) 977.)

Appellants, in their defense, called witnesses, experienced in handling trucks, who had not seen the accident, but had seen the body of Joyce Brown lying on the highway and had observed the distance from it to where the truck was standing. They were asked to assume the truck, with its load, weighed approximately ten thousand pounds and was traveling approximately fifteen miles per hour, and, basing their opinions on the position of the body and of the truck after the accident, to state whether the driver of the truck had made a good stop. Each answered that, in his opinion, it was a good stop. In rebuttal, respondents produced the testimony of witnesses, experienced in handling trucks, who testified, in answer to a hypothetical question containing the material facts shown by the evidence, that, in their opinion, it was not a good stop. Appellants objected to this testimony and their objections were overruled. They urge:

"1. That it was not a subject for expert testimony;

"2. That the hypothetical questions propounded were predicated on facts not in evidence and omitted material facts that were in evidence;

"3. That the questions propounded called for answers that were mere conjecture or guesses;

"4. That the testimony was improper rebuttal."

The contention that respondents' hypothetical questions were predicated on facts not in evidence, and omitted material facts that were in evidence, is not sustained by the record.

Appellants, having introduced testimony of experts, experienced in handling trucks, to the effect that, assuming the facts stated in the questions to be true, the driver of the truck had made a good stop, are not in position to urge error was committed in permitting respondents to introduce testimony of like experts, to the contrary, in rebuttal.

Appellants specify that:

"The Court erred in denying appellants' motion for directed verdict, for the reason that the evidence conclusively shows that the negligence of the deceased was the proximate cause of the accident resulting in her death."

In *Hobbs v. Union Pacific R. R. Co.*, 62 Ida. 58, 108 Pac. (2d) 841, we quoted from *Claris v. Oregon Short Line R. R. Co.*, 54 Ida. 568, 573, 33 Pac. (2d) 348, 349, as follows:

"The rule, we think, is that in a motion for nonsuit or directed verdict the evidence must be construed in the light most favorable to plaintiff. It is only where there is an entire absence of testimony tending to establish the case that a nonsuit may be properly ordered or a directed verdict granted. Where the question depends on a state of facts from which different minds may honestly draw different conclusions on that issue the question must be submitted to the jury for determination. Where facts are disputed or inferences therefrom are reasonably disputable, the question is one for the jury."

In the Hobbs case, we also quoted from *Department of Finance v. Union Pac. R. Co.*, 61 Ida. 484, 499, 104 Pac. (2d) 1110, 1116, as follows:

"The question of contributory negligence is for the jury, and never one of law, unless the facts alleged in the complaint or proven are reasonably susceptible of no other interpretation than that the conduct of the injured party

caused, or contributed to, his injury, and that, because of his negligence and carelessness, he did not act as a reasonably prudent person would have acted under like circumstances. *Adkins v. Zalasky,* 59 Idaho 292, 81 P. 2d 1090; *Allan v. Oregon Short Line R. Co.,* 60 Idaho 267, 90 P. 2d 707; *Smith v. Oregon Short Line R.R. Co.,* 32 Idaho 695, 187 P. 539; *Fleenor v. Oregon Short Line R.R. Co.,* 16 Idaho 781, 102 P. 897.".

Appellants assign as error the giving of an instruction with respect to speed which is *prima facie* lawful, in certain cases, and say in their brief:

"Appellants complain that it was error for the Court to give that portion of Instruction No. 5, which advised the jury that the maximum speed limit was fifteen miles an hour when approaching an intersection where the driver's view is obstructed, for the reason that there was no evidence in the record that the appellant Harris' view was obstructed so as to invoke the fifteen mile limit at that point."

The statute from which the instruction was taken is I. C. A., sec. 48-504, which provides, in effect, that it is *prima facie* lawful, subject to conditions not necessary to state here, to drive a vehicle fifteen miles an hour, when approaching within fifty feet of an intersection of highways, when the driver does not have a clear and uninterrupted view of such intersection, and of the traffic upon all highways entering it, for a distance of two hundred feet from the intersection. The facts of this case made proper the giving of an instruction to that effect.

The testimony of R. L. Brainard shows he, at the time of the accident, owned the property located at the southeast corner of the intersection, consisting of four lots facing on Division Street and the highway, and that at that time the lots were occupied by five dwelling houses. He was asked, by counsel for appellants, on cross-examination:

"Q. As a matter of fact this corner, these houses of yours, created a very dangerous condition as far as motors turning east on Cameron [the highway], did they not?

"A. That is true."

This assignment of error is without merit.

The evidence shows that, at the time of the accident, there was the usual stop sign on a post on the east side of Division Street, as it approached the highway from the south, and one on the west side of the street, as it approached the highway from the north; that there was affixed to the pavement in the center of Division Street, at the south side of the intersection, a red lens, referred to in the record as an "owl's eye," and on that device appeared the word "stop." In addition to these stop signs was a device which appellants' counsel describes, in their brief, as follows:

"Suspended over the center of the intersection was an automatic device referred to by some witnesses as a 'blinker light' and by others as a 'flasher light.' This device had four large lenses, two of which were red and two of which were orange. Upon the red lens the word 'stop' was printed in raised glass letters, and on the orange lens the word 'caution' was printed in raised glass letters. The two red lenses bearing the word 'stop' pointed north and south on Division Street and the two orange lenses bearing the word 'caution' pointed east and west on U.S. Highway No. 10. Enclosed within the device was the electric light which flashed on and off intermittently."

The judge instructed the jury, in instruction No. 6, as follows:

"I charge you that Section 48-518 of Idaho Code Annotated provides, among other things:

" 'RIGHT OF WAY. c. The driver of any vehicle upon a highway within a business or residence district shall yield the right of way to a pedestrian crossing such highway within any clearly marked crosswalk or any regular pedestrian crossing included in the prolongation of the lateral boundary lines of the adjacent sidewalk at the end of a block, except at intersections where the movement of traffic is being regulated by traffic officers or traffic direction devices. Every pedestrian crossing a highway within a business or residence district at any point other than a pedestrian crossing, crosswalk or inter-

section shall yield the right of way to vehicles upon the highway.'

"I instruct you that the term 'traffic direction devices' as used in the foregoing statute means some device which controls traffic on both streets at the intersection, such as the ordinary stop and go devices now in common use.

"I instruct you further that the term 'traffic direction devices' does not mean the ordinary stop sign on a street or highway, nor does it mean the so-called flasher light frequently placed at intersections."

Appellants assign as error the giving of that instruction, and particularly the last two paragraphs thereof.

The "flasher light," while more conspicuous, has the same legal effect as the "owl's eye" or the ordinary stop sign on the roadside. Each requires a traveler, approaching the intersection, to stop before entering it. Neither the "flasher light," the "owl's eye," nor the stop sign directs traffic in the sense it is directed by a police officer or a "stop and go" sign. The police officer or the "stop and go" sign indicates to the traveler he may, or may not, enter the intersection, and thus directs traffic. Neither the "flasher light," the "owl's eye" nor the stop sign does this, and they are not "traffic direction devices" within the meaning of the statute. In *Quinn v. Rosenfeld,* 102 Pac. (2d) 317, 319, the Supreme Court of California said:

"We find no merit in the contention that the provisions of section 563 of the Vehicle Code were applicable. It appears that there were 'stop' signs at the intersections, but there was no evidence that the intersections were controlled by a 'traffic control signal device' or by a police officer. An unchanging lettered 'stop' warning is a sign, not a controlled 'stop and go' signal. The language of the section, which also refers to control by police officers and prohibits crossing against a red or stop signal, must necessarily refer to mechanically controlled stop and go signals, which are operating, as 'traffic control signal devices.' *Brown v. Regan,* 10 Cal. 2d 519, 75 P. 2d 1063." (See, also, *Buchanan v. Marcusen,* (Minn.) 265 N. W. 319.)

By instruction No. 27, the court charged it

was the jury's duty to determine, from the evidence, whether or not, at the intersection in question, traffic was controlled by traffic direction devices. Appellants complain that instructions No. 6 and No. 27 are inconsistent and irreconcilable. That is true, but appellants are not in position to complain of it. They requested the court to give an instruction which left to the jury, for decision, the question as to whether traffic at the intersection was regulated by traffic direction devices. Appellants' requested instruction was erroneous. They are not in position to complain of an erroneous instruction, given at their request, on the ground that it is in conflict with another instruction. (*Bennett v. Deaton,* 57 Ida. 752, 769, 68 Pac. (2d) 895, 903.)

The court instructed the jury:

"I instruct you that where there are no eye witnesses when a person is killed, and there are no circumstances indicating clearly to the contrary, there is a presumption that at the time of the accident the deceased was exercising all due care and caution. I instruct you that where there are witnesses, if the evidence against said presumption is clear, convincing and uncontradicted, then the evidence will prevail as a matter of law against the presumption, but if reasonable minds might differ as to the conclusions to be drawn from the evidence opposed to the presumption, then the presumption has the weight and effect of evidence and is to be considered by you in connection with the contrary evidence."

Appellants insist the court erred in giving that instruction, "for the reason that respondents produced eye witnesses who testified to the movements and conduct of the deceased child immediately preceding the accident and hence the jury was not entitled to indulge the presumption that the child exercised due care and caution." Appellants introduced testimony contradicting that of respondents' witnesses as to the movements and conduct of the child immediately preceding the accident, and tending to show her death was due to her negligence.

The rule in this state is that:

"Where there are eye-witnesses to an accidental killing, evidence which is clear, convincing, and uncontradicted

will prevail as a matter of law over the presumption that the person killed was using due care, but if reasonable minds might differ as to the conclusions to be drawn from evidence opposed to the presumption, it is proper to instruct the jury as to the presumption." (*Geist v. Moore*, 58 Ida. 149, 165, 70 Pac. (2d) 403, 410; *Department of Finance of State v. Union Pac. R. Co.*, 61 Ida. 484, 492, 104 Pac. (2d) 1110, 1112.)

Appellants assign as error the giving of instructions submitting to the jury the question of last clear chance to avoid the accident, and assert:

"that no evidence or reasonable inference from evidence showed that the defendant had observed, or by the exercise of reasonable care could have observed, the child, Joyce Brown, in a position of peril, or that the defendant Harris had any reasonable opportunity to have prevented· her running into or striking the truck."

As heretofore pointed out, Harris testified that, after entering the intersection, he saw Doris and Joyce Brown, probably four or five feet from the curb at the south side of the intersection; that the smaller girl (Joyce) pulled ahead of her sister and the sister tried to hold her back; that he saw Joyce pull away from Doris and she ran right at the side of the truck and hit it. It may be inferred, reasonably, from that testimony, and from the map in evidence, that when Harris saw Joyce pull away from her sister and start toward the truck she was thirty or thirty-five feet from it. The record justifies the submission of the question of last clear chance to the jury.

In this connection it may not be amiss to again state that it is matter of common knowledge that children may run, unexpectedly, on or across streets and other highways; that motorists must be assumed to have knowledge of use of such thoroughfares by children, and, where their presence can be observed, a degree of care commensurate with the emergencies presented must be exercised. Motorists must not assume children of immature years will exercise care necessary for their protection, and not expose themselves to danger. (*Bennett v. Deaton*, 57 Ida.

752, 770, 68 Pac. (2d) 895, 903; *Byington v. Horton*, 61 Ida. 389, 396, 102 Pac. (2d) 652, 654.)

 One of the grounds relied on, in support of their motion for new trial, was that the court erred in instructing the jury that, in fixing respondents' damages, they could consider loss of services of the deceased child. This contention is based on the theory that no claim for loss of services was made in the complaint. The allegation in the complaint, applicable to this contention is:

"Plaintiffs further allege that said minor child at the time of said accident and at all times was in good health, an intelligent, talented, robust child, living at home with her parents and affording them comfort, companionship, society and assistance, that by the death of said child in the manner hereinbefore stated, plaintiffs have been forever deprived of said comfort, companionship, society and assistance of said minor child, the said Joyce Brown, to their damage and loss in the sum of $25,000."

The allegation is sufficient to support the instruction.

Appellants assign as error the action of the court in overruling their motion for a new trial. One of the grounds relied on is newly discovered evidence of two witnesses, who made affidavits, in support of the motion, they saw the little girl run against the side of the truck. Testimony to that effect was given by Harris and was corroborated by Carlson, who testified to seeing the left hind wheel of the truck run over the child; also by other witnesses who testified to the imprint of a hand on the left door of the cab.

The granting, or refusing to grant, a new trial is largely in the discretion of the trial court, and an order denying it will not be reversed because of newly discovered evidence which is cumulative. In *Flannagan v. Newberg*, 1 Ida. 78, the question now under consideration was before the court and the portion of the opinion disposing of it is reflected in the first and second sections of the syllabus, as follows:

"CUMULATIVE EVIDENCE.—When newly discovered evidence relates to a substantial point or particular fact which was inquired into on the trial, it is cumulative."

"NEW TRIAL—NEWLY DISCOVERED EVIDENCE

—PRACTICE.—If the newly discovered evidence brings to light some new fact bearing upon the main question at issue, and would be likely to change the result, a new trial should be granted." (See, also, *Knollin v. Jones*, 7 Ida. 466, 476, 63 Pac. 638, 641; *Hall v. Jensen*, 14 Ida. 165, 174, 93 Pac. 962, 965; *Montgomery v. Gray* (on rehearing), 26 Ida. 585, 586, 144 Pac. 646, 647; *McAllister v. Bardsley*, 37 Ida. 220, 223, 215 Pac. 852; *Younie v. Sheek*, 44 Ida. 767, 775, 260 Pac. 419, 422; *Livestock Credit Corp. v. Corbett*, 53 Ida. 190, 198, 22 Pac. (2d) 874, 877.)

The writer hereof believes there was no abuse of discretion of the trial judge in denying a new trial, and that the judgment and order appealed from should be affirmed. Chief Justice Budge authorizes me to say he concurs in this opinion. The majority of the court is of a contrary opinion, which has been expressed by Justice Ailshie, and concurred in by Justices Givens and Holden, as follows:

"In view of the fact that the witnesses were not agreed as to which side of the truck the little girl was on and that no witness claimed to have seen the actual impact which caused her death, it seems to me that a new trial ought to be granted on account of the discovery of the two witnesses, Eugene Gill and Charlotte Carroll, whose affidavits were submitted on motion for new trial. These witnesses were standing talking at the southeast corner of the intersection of Cameron Avenue and Division Street, and both had an unobstructed view of the intersection and the entire incident which occurred. Mr. Gill states in his affidavit as follows:

" 'I saw a little girl run from the southwest corner of the intersection of Division and Cameron in a northerly direction and as she reached a point near the center of the street angled slightly to the northwest. As she reached a point very near the truck, not over a foot and a half or two feet, a woman on the curb at the southwest corner of the intersection screamed and I also cried out, and the little girl turned partly around but at the same time continued running northwesterly and ran directly into the left side of the cab of the truck, she fell or was knocked

down to the pavement by the impact of running into the truck, and the wheel on the left side ran into her and it seemed to me that she was struck by some part of the rear of the undergear of the truck and carried westerly and slightly northerly by the undergear of the truck.'

"Miss Carroll's [Mrs. Benz'] affidavit is to the same effect. These witnesses were residents of Spokane and give as their reason, for not making themselves known to the parties, that they did not want to be taken away from their business to act as witnesses in the case; and that they did not disclose what they knew about the matter to any of the parties and that it was only after the trial, verdict and judgment they apprised anyone of their knowledge of the transaction.

"I do not think this evidence can be properly deemed cumulative evidence. (23 C. J., p. 10, par. 1739.) The witnesses saw the transaction from an entirely different angle and viewpoint; they had an unobstructed view and their attention was not diverted by anything else, such as where they were going or the surrounding crowd of pedestrians. Moreover, their affidavits supply independent circumstances which might very well influence the minds of the jurors. (*McAllister v. Bardsley*, 37 Ida. 220, 225; *State v. Cox*, 55 Ida. 694, 697; *Dent v. Simpson*, (Kans.) 105 Pac. 542, 544; *Davis v. Sim*, (Kans.) 140 Pac. 851, 852.)

"I also think that the italicized portion of the following instruction should not have been given the jury:

" 'I instruct you that where there are witnesses, *if the evidence against said presumption is clear, convincing and uncontradicted,* then the evidence will prevail as a matter of law against the presumption, but if reasonable minds might differ as to the conclusions to be drawn from the evidence opposed to the presumption, then the presumption has the weight and effect of evidence and is to be considered by you in connection with the contrary evidence.'

"Now it is true and we have so held (*Geist v. Moore*, 58 Ida. 149) that *'evidence which is clear, convincing, and uncontradicted* will prevail as a matter of law over the presumption that the person killed was using due care.'

But the converse is not the law, namely, that, in order to overcome a presumption of law, the evidence must be 'clear, convincing and uncontradicted,' the jury should not be so instructed."

For the reasons stated by Justice Ailshie, with reference to granting a new trial, and revising the instruction, the judgment and order appealed from are reversed with direction that a new trial be granted.

The allowance of costs on appeal will await the final decision of the case.

ON REHEARING
(April 29, 1941)

MORGAN, J.—Respondents petitioned for a rehearing of our decision, granting a new trial to appellants. The rehearing was had April 21, 1941, and, after further consideration, the members of the court adhere to the views heretofore expressed by them. Therefore, the decision, granting a new trial, will not be disturbed.

Budge, C. J., and Givens, Holden and Ailshie, JJ., concur.