**COTANT et al. v. UNITED STATES.**
No. 1684.

United States District Court
D. Idaho, E. D.
March 7, 1952.

Milton E. Zener, Pocatello, Idaho, Ben Peterson, Pocatello, Idaho, for plaintiffs.

John A. Carver, U. S. Dist. Atty., Paul S. Boyd, Asst. U. S. Dist. Atty., Herman J. Rossi, Asst. U. S. Dist. Atty., all of Boise, Idaho, for defendant.

CLARK, District Judge.

This action was brought pursuant to Title 28 U.S.C.A. § 2674. At the conclusion of trial before the Court, the Court ordered briefs filed by the respective parties and took the matter under advisement. Briefs have been filed and considered by the Court.

The evidence shows that John O. Cotant is the minor son of J. O. Cotant, Jr., and are both parties plaintiff in this action.

The evidence further shows that one Max Noble was an employee of the United States as a mail carrier and at the time of the accident here in question was driving a mail truck and was acting within the course and scope of his employment.

On or about the 21st day of February, 1950, while he was so acting as an employee of the United States, he was operating a mail truck along what is known as Dogwood Street within the city limits of the City of Pocatello, Bannock County, Idaho. This was strictly a residential section of the city. There were from fifteen to twenty children in that neighborhood and in the immediate vicinity of the Cotant home and on the day of the accident six children were in the yards. Their ages ranging from three and one-half to five years old. The Cotant child, plaintiff herein, was running across the street in front of a car parked on the right side of the street. That is, on the right side of the street facing in the direction in which the mail truck was being driven by Noble. As the child came by this parked car he ran into the side of the mail truck and was seriously injured. There is some question as to the rate of

speed of the mail truck and it is not material here. However, it was traveling about twenty-five miles per hour and it is the opinion of the Court that it was in excess of twenty miles per hour which is the legal speed limit as fixed by the city ordinance.

The driver of the truck was well acquainted with this neighborhood having driven the mail truck for some time (about a year) along this street prior to the accident. There can be no question but what the driver of the mail truck knew he was driving through a neighborhood where there was a number of children. There were five children within his view if he had been looking at the time in question here. There was a clear and unobstructed view of this whole area including the movement of the children. The Court viewed the place and neighborhood where this accident happened and found nothing to obstruct the view. On the date in question there was only one car parked on the curb on the right side of the driver. It was at this car that the boy came into contact with the mail truck. There were several cars parked at the curb on the left side of the driver. Max Noble, the driver of the truck, immediately after the accident at the hospital, in a conversation with the witness J. O. Cotant, Sr., grandfather of the injured child, said to Mr. Cotant: "That he was sorry that the accident had to happen and he said to tell the truth he didn't even see the boys. He said he was looking down the street to determine where the other mail carrier was." (T–109) This statement was also made to Dora Cotant, the grandmother. (T–111)

He was looking for the other mail carrier; if this is true then he would be looking at 710 Dogwood Street, because it was at this point where he was to meet the other mail carrier, Burtasse. This was to the driver's left. This explains why he did not see the car which was the only car parked to his right. He saw other cars parked on the same street. They were to his left on the same side of the street where the residence numbered 710 was located. This is the place where Burtasse always awaited the arrival of the truck. (T–67)

In the operation of this mail truck with the knowledge he had from a year's experience in driving this street, Noble was duty bound to exercise reasonable care for the safety of the children of this residential section as he would have had he been driving by a school house. Byington v. Horton, 61 Idaho 389, 102 P.2d 652. As stated in Cyclopedia of Automobile Law and Practice, Blashfield, 2A, Sec. 1491, as follows: "Of all the cases of destruction of lives and homes that have followed in the wake of the motor vehicle, that of the mangling of the children beneath its wheels carries the most poignant sense of tragedy. This is partly due to the contrast between their innocence and helplessness on the one hand and the ponderousness of the machine that crushes them into the earth on the other. The safeguarding of the child has always appealed to the protective instincts of men, whether civilized or savage, and the humanitarian driver of an automobile, when the time and place is such that the presence of children in the neighborhood, and therefore their excursions into the streets, may reasonably be expected, will have his machine under such control that it can be stopped almost instantly. Courts have said that careful and competent drivers do not have accidents. While this statement, of course, is not intended to be taken in its exact literal import, there is some element of truth in it, and it ought certainly to be made true where children are concerned."

This driver was chargeable with seeing the children both in front of him and to his left and right. This is the rule pronounced in the case of Bennett v. Deaton, 57 Idaho 752, 68 P.2d 895.

Without further detailing the evidence the Court in taking the testimony as a whole is satisfied that the driver of the Government mail truck was clearly guilty of negligence.

The remaining matter for the Court to determine is the amount of damages that should be awarded. There is no monetary amount that will compensate this boy for the injuries he has suffered and in all probability will suffer to some extent for the balance of his life. The injuries he re-

ccived as to scalp wound on the head, fractured bone and the other cuts and bruises while they must be considered are minor to the one great injury, the "ruptured urethra". This rupture was caused by the accident. He underwent surgery for this on February 21, 1950, and again on March 2, 1950, and again on April 2, 1950 for a cystostomy requiring anesthetic. The same on April 10 and 13; again on May 15, June 9, June 16; he was again in the hospital July 25, August 21, and September 25. These operations continued regularly up to date of trial. The treatments were so painful that the doctor felt that an anesthetic was necessary. The Doctor is of the opinion that these operations will continue for the rest of the child's life. The Doctor testified in part as follows:

"A. We admitted the child to the hospital, gave an ether anesthetic and then we have a special type of dilators to pass through the urethra, a set of them,—they pass through the urethra to the bladder. We start with the small size of dilator and add as much as we can within reason. After the urethra has been dilated and the scar tissue opened we insert a catheter and leave it for five days to hold that open. After that period we remove that catheter then he does pretty well for two or three or four weeks and then gradually that scar tissue begins to contract and he isn't able to void so well, then we take him back and go through that procedure again.

"Q. According to your testimony or perhaps Mrs. Cotant's he is about scheduled for another treatment? A. Yes sir.

"Q. The last was on November 5th? A. Yes sir.

"Q. With your knowledge of the nature of this injury and the type of treatment, what is your opinion as to the duration of this type of treatment necessary to assist in this condition which you have described? A. This rupture of the urethra heals with scar tissue as in any other portion of the body and scar tissue has a tendency to contract; that is particularly true of the urethra. This forms a stricture here. This scar tissue contracts and as this child goes on into adolescence he will have to continue this treatment to see that the opening through the scar tissue stays open relative to the general development of the genital organs. The urethra increases in size as the child increases in size and this will have to be kept dilated to be sure that it develops with his general development. As far as the outlook is concerned at the present time this will be prolonged indefinitely. This type of treatment has to be checked relative to his general development, as the child develops this will have to be checked closely, and after he develops it will have to be checked to keep this urethra open. With the scar tissue it may require treatment the rest of his life.

"Q. The purpose of this is to keep a passage for the urine? A. That is right.

"Q. And that may very well continue the rest of this child's life, is that true? A. That is right.

"Q. What can you tell the Court as to whether or not this type of treatment is painful? A. It is quite painful, that is the reason we have taken him to the hospital for all these treatments, it was just too painful for him to stand without an anesthetic and I would not administer one without an anesthetic, it would be wrong to put the child through this treatment without an anesthetic.

"Q. As this child grows through adolescence and becomes an adult, what, if any, effect could this type of injury have on his sexual ability after he has matured and becomes a man? A. With an injury of this type; the location of this injury is at the base of the prostrate gland and of course, with all the treatment that the child has had and with the treatment which he is going to have in the future he is bound to develop a certain psychic reaction to all this physical treatment and further with all this actual physical manipulation there could result impotency or sterility."

The Government saw fit not to call any doctors to rebut this evidence.

■ This is one of the most pathetic cases that has come to the attention of this Court. Here we not only have the pain and suffering which this child has already endured but the pain and suffering that he will have in the future, possibly for the

balance of his life. He should be placed in a position where he can receive the best of medical treatment in an effort to live a normal life. This Court has a great responsibility placed upon it by the statute under which this case was brought. The Government must be protected against unreasonable claims, also the rights of its citizens must be carefully weighed and protected. This I have considered carefully and I have concluded that the Plaintiff J. O. Cotant be awarded the sum of Fifty-five Thousand Dollars ($55,000), and J. O. Cotant, Jr., be awarded the sum of One Thousand Six Hundred and Twelve Dollars and Seventy-one Cents ($1,612.71).

As part of the sum awarded the plaintiffs, Milton E. Zener and Ben Peterson, attorneys for the plaintiffs, are hereby allowed attorneys' fees in the sum of Eleven Thousand Three Hundred Dollars ($11,300).

Counsel for the plaintiffs may prepare findings of fact, conclusions of law and judgment consistent herewith for submission to the Court for approval.