(No. 6738.  May 3, 1940.)

HAROLD R. BYINGTON and GWEN BYINGTON, Respondents, v. JEWELL HORTON, Sr., Appellant.

[102 Pac. (2d) 652.]

J. F. Martin, Hamer H. Budge and Merrill & Merrill, for Appellants.

Anderson, Bowen & Anderson, for Respondents.

HOLDEN, J.—April 25, 1938, there was, and for several years prior thereto had been, a hard-surfaced highway 18 feet in width, running from Pocatello through the village of Alameda in a general northerly direction to Blackfoot, Idaho, known as U. S. Highway No. 91. And on April 25, 1938, appellant Jewell Horton, Sr., was, and for many years prior thereto had been, employed by Bannock county in the maintenance and supervision of county roads. In his work of supervising roads, Horton drove an old 1929 Chevrolet pick-up truck furnished by the county. On the last-mentioned date, and for some time prior thereto, respondents resided about a mile north of the village of Alameda on the east side of the highway.

Shortly after 1 o'clock in the afternoon of April 25, 1938, respondent Gwen Byington handed a note to her little son, William Kay Byington (about five years and two months of age), to take to a neighbor (a Mrs. Burke) living on the west side of the highway about 400 feet south of the Byington home. To reach the Burke home it was necessary for the boy to cross over to the west side of the highway and then walk south. Immediately after receiving the note from his mother the boy started on his errand. At that time appellant Horton, accompanied by one Guido, was driving north on the highway at a rate of speed variously estimated at from 15 to 20 miles per hour. A wind was blowing to the northeast. It blew the note out of the boy's hand—he instantly started running diagonally across the highway to recover the note. While so running across the highway the boy was struck by the Chevrolet truck, and, as a result of the injuries received, died in a hospital about two hours later.

May 11, 1938, his parents (respondents) commenced this action to recover $50,252 damages alleged to have been sustained

by reason of the alleged wrongful death of their son. By the original complaint the Great Lakes Casualty Company was joined as a party defendant. It demurred to the complaint upon the ground it was improperly joined as a defendant. The demurrer was sustained and an amended complaint filed against appellant only. The cause was tried beginning May 25, 1939. May 27, 1939, the jury returned a verdict for $3,252. On the same day judgment was entered thereon. The appeal is from the judgment.

On *voir dire* each juror was asked in substance, over the objections of appellant, whether he had ever been employed by or owned any stock in the Great Lakes Casualty Company; whether any member of his family had been employed by that or any insurance company engaged in the business of insuring against automobile accidents, and whether he had ever been engaged in the accident insurance business. It is contended the trial court erred in permitting such examination in that, it is insisted, the examination was not made in good faith, but for the purpose of informing the jury an insurance company was interested in defeating a recovery of damages.

In *Shaddy v. Daley*, 58 Ida. 536, 76 Pac. (2d) 279, we had a similar contention before us. We said (p. 539):

"Appellant complains of the conduct of counsel for respondents in propounding the following question to a prospective juror on his *voir dire* examination:

" 'Are you or have you been employed by an insurance company insuring automobiles and trucks against accidents?'

"The theory on which this assignment is based is that the question had a tendency to inform the members of the jury that appellant was protected by insurance against loss in the event a judgment for damages, because of the accident, should be secured against him. If respondents' counsel was not in good faith in propounding the question to the prospective juror, in an effort to ascertain whether or not he was, or had been, engaged in employment which would have a tendency to bias him in his consideration of the case, it is not apparent from the record. He was within his rights in propounding the question. (*Wilson v. St. Joe Boom Co., Ltd.*, 34 Ida. 253, 200 Pac. 884; *Cochran v. Gritman*, 34 Ida. 654, 203 Pac.

289; *Bressan v. Herrick*, 35 Ida. 217, 205 Pac. 555; *Faris v. Burroughs Adding Machine Co.*, 48 Ida. 310, 282 Pac. 72.)''

In the Faris case, cited in *Shaddy v. Daley, supra,* we quoted the following language with approval:

'' ' . . . . we are of the opinion it is the privilege of a party within reasonable limits and good faith, to ascertain the oc· cupation of a juror and the extent of his possible interest in the trial and the questions here went no further than this. Page, in answer to a question objected to, stated that he was agent for several casualty insurance companies. It was natural and proper for plaintiff's counsel to ascertain whether any one of these several companies had issued an indemnity policy to defendant. Nobody can reasonably contend that, if such were the case, the resident agent of such company would be a competent juror. Counsel for plaintiff would have been negligent of his client's interest had he failed to inquire as to this fact. The question was justifiable under the particular circumstances disclosed here.' '' (*Lidfors v. Pflaum,* 115 Or. 142 [205 Pac. 277], 236 Pac. 1059.)

And after also quoting:

'' 'It is entirely proper for counsel to ask the jurors such questions as may reasonably be necessary to ascertain whether they are free from a bias or interest that may affect their verdict. To this end it is proper for counsel in good faith, to ask of each juror whether he is interested as an agent or stockholder or otherwise in a specified casualty company. Or he may be asked the broad question whether he is interested in any insurance company insuring against liability for negligence.' '' (*Arnold v. California Portland Cement Co.*, 41 Cal. App. 420, 183 Pac. 171), we said: ''Apparently the weight of authority, at least by number, is to the effect that such questions may be asked but not in such a way as to emphasize to the jury that the defendant is in fact insured against liability because of the accident.''

As in *Shaddy v. Daley, supra,* it is not apparent from the record before us either that the questions were asked in bad faith or for the purpose of emphasizing to the jury the fact Horton was protected by insurance against loss in the event of a recovery of damages.

The court instructed the jury:
"That it is a matter of common knowledge that children may at unexpected moments run upon or across the part of the thoroughfares used for vehicles. The use of such thoroughfares by such children, motorists must be assumed to have knowledge of, and where their presence can be observed, a degree of care commensurate with the ordinary emergencies presented in these instances must be exercised. One driving a vehicle must not assume that children of immature years will exercise the care required for their protection and will not expose themselves to danger."

This instruction was approved in *Bennett v. Deaton,* 57 Ida. 752, 770, 68 Pac. (2d) 895. It is contended the instruction is not applicable to the facts of this case in that "(a) said accident did not happen around a school house or other place where children are commonly known to congregate and play, and (b) it makes the driver of an automobile practically a guarantor and insurer against an accident involving a child, and (c) it deprives him of the right of the defense of contributory negligence against a parent in sending an unaccompanied minor child of tender years out onto a heavily trafficked highway."

Appellant Horton testified he was "around ninety feet" from the boy when the boy crossed the highway from east to west; that from the time he first saw the boy so crossing the highway he (the boy) "was in plain view," and that all he did was to take "his foot off the gas." The instruction was applicable in that "it is a matter of common knowledge that children may at unexpected moments run upon or across the part of the thoroughfares used for vehicles. The use of such thoroughfares by such children, motorists must be assumed to have knowledge of, *and where their presence can be observed,* a degree of care commensurate with the ordinary emergencies presented in these instances must be exercised." (Italics mine.) Having seen the little fellow crossing the highway "around ninety feet" in front of him, Horton was under the same duty to exercise at least reasonable and ordinary care for his safety as he would for the safety of numerous children had he been driving past a "school house or other place where children are commonly known to congregate and

play." There is no merit in any of the objections to this instruction.

■■ Objections are also made to other instructions and to the refusal of the court to give certain requested instructions. A careful examination discloses the trial court very fully and correctly instructed the jury upon every material issue and that it quite properly refused to give the instructions requested. Moreover, error is never presumed on appeal, and the burden of establishing error is upon the party alleging it (*Judy v. Reilly Atkinson & Co., Inc.,* 59 Ida. 752, 757, 87 Pac. (2d) 451; *State v. Snoderly, ante,* p. 314, 101 Pac. (2d) 9).

■ Both parties, appellants and respondents, requested the trial court to instruct the jury on the law of the case prior to the argument of counsel. The request was denied, the court saying he did not "have his instructions ready at this time, and if I instruct first, it will be six o'clock before the case gets to the jury, . . . . " The denial of the request is assigned as error. Section 7–206, I. C. A., provides the order of trial in this state as follows:

"When the jury has been sworn, the trial must proceed in the following order unless the judge for special reasons otherwise directs:

1. . . . . . . . .
2. . . . . . . . .
3. . . . . . . . .
4. When the evidence is concluded and before the case is argued or submitted to the jury, either party may request the court to give to the jury instructions in writing on the law arising in the cause, which shall be given or refused as asked:
. . . .
5. . . . . . . . .
6. . . . . . . . .
7. . . . . . . . . "

The statute expressly clothes the trial court with power to change the order of procedure where there is a *special reason,* for instance, as in the case at bar, to expedite the trial by requiring counsel to argue the case while the instructions were being prepared.

While many alleged errors are assigned, the decisive question presented by the record is: Did appellant have the last clear chance to avoid the accident and could he have done so by the exercise of reasonable and ordinary care?

Appellant Horton testified on direct examination:

"Q. You were traveling north (at the time of accident), as I understand it, Mr. Horton?

"A. Yes.

"Q. When,—where was the little fellow with reference to the black strip in the center of the road when the paper blew out of his hand?

"A. I would say he was about two feet to the west of the center of the road.

"Q. Yes. Then what happened?

"A. He proceeded along about that course until within a few feet of my truck.

"Q. Yes. When you first saw him start across the road to the west after coming out from his house, what part of the paved portion of the highway were you driving upon?

"A. On the east portion.

"Q. That which—that would be which—your right or left hand?

"A. My right hand side.

"Q. Your right hand side?

"A. Yes, sir.

"Q. What, if anything, did you do when you saw him start south about moving over to the right edge of the pavement, if anything?

"A. What did I do?

"Q. Yes.

"A. When I saw him start across the highway up ahead of me, I eased up on the gas feed.

"Q. Yes, and what, if anything, did you do, when you saw him coming toward you with reference to moving over to your right hand side, if anything?

"A. I swung the truck to the right when I saw the little boy start coming in front of me.

"Q. Now, how far were you from him, or was he from you, when the paper blew out of his hand, if you know?

"A. I would say approximately fifteen feet. I never measured it.

"Q. And in which direction did he start to run after the paper blew out of his hand?

"A. In a northeasterly direction.

"Q. And you were traveling north?

"A. North.

"Q. What did you do with the truck when you saw him start to run over in front of your truck?

"A. I swerved to the right.

"Q. And what happened?

"A. Well, just as my truck, as near as I could tell you, gentlemen, reached the edge of the eastern edge of the pavement, the little fellow was struck."

.   .   .   .   .   .   .   .   .   .   .   .   .

"Q. How fast were you traveling as you came up the road before you saw him?

"A. I think around 18 or 20 miles an hour.

"Q. And did you reduce your speed between the time you first saw him and the time the accident occurred?

"A. I did. I eased up on the gas feed.

"Q. Do you know whether or not you applied your brakes when you saw that little fellow start to run in front of you?

"A. I think that I did. I can't say positive that I did or didn't. My recollection was that my foot went on the brake."

.   .   .   .   .   .   .   .   .   .   .   .   .

"Q. Have you any recollection as to whether you put on your brakes, or didn't put them on?

"A. That is, when the accident occurred?

"Q. Yes.

"A. No sir; I don't have any. I can't say."

On cross-examination, Horton testified:

"Q. Now you say you were how far from the boy when he crossed the street from the east to the west?

"A. I would estimate it around ninety feet.

"Q. And how far do you say that he crossed over the center line of the highway?

"A. I would say about two feet."

.   .   .   .   .   .   .   .   .   .   .   .   .

"Q. Now, at all times, Mr. Horton, from the time you first saw that little boy start across the road, go past the center line and then turn south, he was in your plain view, wasn't he?

"A. Yes, sir.

"Q. You could see him at all those times?

"A. Yes, sir.

"Q. And all you did was to take your foot off the gas?

"A. Yes, sir."

. . . . . . . . . .

"Q. Where was the left hand front wheel of your car when the collision occurred?

"A. Well, I think I mentioned that to you once. Gentlemen, I don't know whether it was just on the edge of the slab, or just off the slab on the edge of the gravel, but it was close to the edge.

"Q. And you don't know whether the boy was on the gravel or on the pavement when you struck him?

"A. I do not."

. . . . . . . . . .

"Q. You didn't honk the horn?

"A. Not that I recall."

Venna Hess, witness for appellant, testified on direct examination:

"Q. Where did the accident occur? On or off the pavement, if you can tell the jury?

"A. It was off the pavement, because the gravel scattered as he fell.

"Q. Off the pavement?

"A. Yes.

"Q. On which side?

"A. On the east side."

Respondent Harold R. Byington testified:

"Q. And can you tell us where the truck was, whether it was on or off the paved portion of the road at that time (time of accident)?

"A. I couldn't tell exactly."

About twenty minutes after the accident occurred Sheriff Rossiter and Deputy Sheriff Marley arrived and immediately

took certain measurements. Their testimony shows: The pavement is 18 feet wide with a solid shoulder on the east side from 10 to 12 feet wide; that there was a spot of blood 5'4" from the east edge of the concrete pavement; that it was 50 feet from the spot of blood to the driveway of the Byington home; that it was 150 to 175 feet from that spot to the point where the truck came to a stop; that it was 15 feet from the spot of blood back to the point where the left front wheel of the truck left the east edge of the pavement; that there was broken glass at the point where the left front wheel left the pavement; that it was 30 feet from a point on the east edge of the highway opposite the blood spot back to the point where the right front wheel of the truck left the pavement.

These officers at once also tested the brakes of the truck in the following manner: Both officers got into the truck, with the sheriff at the wheel; with the truck traveling at a speed of about 30 miles per hour, the sheriff applied the brakes. Marley testified that at the time the sheriff applied the brakes he could not tell the brakes had been applied; that "the car didn't stop until—until it just stopped of its own will, you might say. I couldn't tell there was any brakes on the car from riding in it." And Sheriff Rossiter testified:

"Q. Could you tell,—could you recognize any perceptible reduction in the speed of the truck after you applied the brakes?

"A. No, sir."

■■ Under the evidence, whether the brakes were negligently inadequate, and if adequate and applied, would have retarded the speed of the truck sufficiently to have avoided striking the child; whether a sounding of the horn, warning the boy of the oncoming truck; whether, if appellant had turned to his left instead of his right, or driven straight ahead, the impact could have been avoided; and, finally, whether under all the facts and circumstances in evidence, appellant had the last clear chance to avoid the accident, were questions for the jury (*Asumendi v. Ferguson*, 57 Ida. 450, 460, 65 Pac. (2d) 713; *Evans v. Davidson*, 58 Ida. 600, 615, 77 Pac. (2d) 661), and it found against appellant. Furthermore, while one person might reasonably draw the conclusion appellant could not have avoided the accident either by turn-

ing to his left or by driving straight ahead, another might, with equal reason, draw the conclusion he could. In *Fleenor v. Oregon Short Line R. Co.*, 16 Ida. 781, 782, 102 Pac. 897, this court held:

"Where the evidence on material facts is conflicting, or where on undisputed facts reasonable and fair-minded men may differ as to the inferences and conclusions to be drawn, or where different conclusions might reasonably be reached by different minds, the question of negligence is one of fact to be submitted to the jury." (*Denton v. City of Twin Falls*, 54 Ida. 35, 28 Pac. (2d) 202; *Call v. City of Burley*, 57 Ida. 58, 69, 62 Pac. (2d) 101; *Bennett v. Deaton*, 57 Ida. 752, 767, 68 Pac. (2d) 895; *Evans v. Davidson, supra.*)

While only those assignments of error deemed necessary to a determination of the appeal have been discussed, we have, nevertheless, examined the following (and other) assignments: that the court erred in denying appellant's request a mistrial be directed because of the *voir dire* examination, hereinbefore discussed; in denying appellant's motion for nonsuit; in permitting appellant to be called for cross-examination under the statute; in permitting respondent Harold R. Byington to estimate the distance between the point where the accident occurred and the point where the truck came to a stop; in permitting testimony concerning a test of the truck's brakes made by the sheriff and deputy immediately following the accident, but find no substantial or prejudicial error. As hereinbefore pointed out, error is never presumed on appeal and the burden of establishing error is upon the party alleging it (*Judy v. Reilly Atkinson & Co., Inc., supra*; *State v. Snoderly, supra.*)

Judgment affirmed. Costs awarded to respondents.

Givens and Morgan, JJ., concur.

Budge, J., deeming himself disqualified, did not sit at the hearing or participate in the decision.

AILSHIE, C. J. (Concurring Specially).—The judgment entered in the trial court in this case appears to be just and ought to be upheld. I think, however, that it was a clear

violation of the statute (sec. 7–206) for the trial court to refuse to instruct the jury prior to the argument of the case by counsel. The pertinent provisions of the statute, directly bearing on this question, are as follows:

Sec. 7–206:

"When the jury has been sworn, the trial must proceed in the following order unless the judge for special reasons otherwise directs;

.   .   .   .   .   .   .   .   .   .   .   .

"4. When the evidence is concluded and before the case is argued or submitted to the jury, either party may request the court to give the jury instructions in writing on the law arising in the cause which shall be given or refused as asked: provided, that the court may also give other and further instructions of its own motion. All of the written instructions given shall be carried by the jury to their room for their guidance in arriving at a correct verdict according to the law and the evidence. The instructions shall then be read to the jury by the court, and unless the case is submitted to the jury without argument, the plaintiff must commence and may conclude the argument.

.   .   .   .   .   .   .   .   .   .   .   .

"6. If either party objects to the giving of written instructions and permitting the jury to take them to their room as provided in fourth subdivision of this section, then instead thereof the course of procedure shall be as follows: The court may then charge the jury, according to the provisions of sections 7–207 and 7–208 . . . . "

Sec. 7–207:

"In charging the jury the court may state to them all matters of law which he thinks necessary for their information in giving their verdict; and if it state the testimony of the case it must inform the jury that they are the exclusive judges of all questions of fact. The court must furnish to either party at the time, upon request, a statement in writing of the points of law contained in the charge, or sign at the time a statement of such points prepared and submitted by the counsel of either party."

In my judgment, the expression contained in the first sentence of section 7–206, "unless the judge for special reasons otherwise directs," has no application to subdivisions 4 and 6, because where one party makes the request under *subdivision 4,* such request may be defeated by the adverse party availing himself of *subdivision 6,* in which event, the instructions will be given in pursuance of the provisions of sections 7–207 and 7–208.

This court entertained the same view of these statutes I am here expressing in the case of *Schmidt v. Williams,* 34 Ida. 723, 732, 203 Pac. 1075, and said:

"*It appears from this statute that the instructions should be read to the jury before argument of counsel.* The record does not disclose that appellants interposed any objection to the order of procedure adopted by the trial court, or requested the court to proceed in the order indicated by the statute. Had such objection or request been made, the case might be different. We do not think such a departure as this from the order prescribed by the statute should be held to be reversible error, *in the absence of such request or objection.*" (Italics supplied.)

The reason this court upheld the judgment in the Schmidt-Williams case was because *objection* was not made to the order of procedure in the trial court. Here it appears that *both parties made the same request,* namely, that the court instruct the jury on the law of the case prior to the oral arguments.

There are many cases in which it might well appear to counsel of great importance to have the instructions given prior to the oral argument, because of the difficult and uncertain legal questions involved in the case and the doubts of counsel as to what view the court will take in giving his instructions. It might prove disastrous to a litigant sometimes to be required to make oral argument on the facts, assuming the law to be one way and have the court immediately follow him by instructing the jury that the law is to the contrary. If the trial of lawsuits is not to be a game of chance but is to be an earnest endeavor to attain justice by the orderly processes of the law, then it is of great importance for the

attorneys and the jury to be advised as to what the court considers the law to be, as applied to the specific case on trial, so that the questions of fact may be intelligently discussed and considered in the light of those principles of law.

Under the circumstances of this case, I am not prepared to hold that the error committed as to the time of giving the instructions was of such a prejudicial character as to justify a reversal of the judgment; and for this reason I concur in an affirmance of the judgment.