(No. 7077. July 7, 1943.)

GEORGE STALLINGER, Sr., and MARY STALLINGER, his wife; MARTHA STALLINGER and FRIEDA STALLINGER, Appellants, v. L. C. JOHNSON and GEORGE GAISER, as co-partners; L. C. JOHNSON, individual, and GEORGE GAISER, individual, Respondents.

[139 Pac. (2d) 460.]

John L. Phillips, Cox, Ware & Stellmon for appellants.

Durham & Hyatt for respondents.

HOLDEN, C.J.—August 4, 1941, the Stallingers (George Stallinger, Sr., at the wheel), Mary Stallinger, his wife, Frieda and Martha Stallinger, daughters of George and Mary Stallinger, drove from Fenn, Idaho to Lewiston, Idaho, on highway 95, generally known as the North and South highway. On the return trip, at about five o'clock in the afternoon of that day, the Stallingers approached the point where what is known as the Webb road intersects highway 95. At the same time L. C. Johnson was approaching the intersection on the Webb road, driving a truck loaded with about forty bushels of wheat. Highway 95 is an oiled, surfaced highway. A yellow center stripe marks the two traffic lanes on the highway. It runs straight for a considerable distance in a southeasterly and northwesterly direction at the point where the Webb road intersects the highway. That road intersects the highway from the west. It is marked with a "stop" sign and is what is known as a farm-to-market road and is unimproved except with macadam and gravel. Highway 95 is an arterial highway. At the intersection, traffic entering highway 95 from the Webb road divides in the form of a "Y", depending on whether the traffic is going to Culdesac to the southeast or to Sweetwater to the northwest on highway 95. The intersection does not cross highway 95. The "Y" is off the main traveled and paved surface of highway 95. The highway is on a higher elevation than the Webb road so that in entering highway 95 from the Webb road vehicles come up onto highway 95 on a slight grade and in approaching and entering the highway have an unobstructed view of traffic in either direction for a considerable distance. The "Y" is cut deeply by trucks hauling grain to Sweetwater, so that loaded trucks ascending the grade from the Webb road to the highway are required to shift gears. Vehicles traveling to Sweetwater enter highway 95 at an angle and cross to the right hand side at an angle. As the cars involved in the accident approached the intersection each driver saw the

other when about the same distance from the intersection. The truck, driven by Johnson, but owned by Gaiser, came to what Johnson called a "rolling stop," Johnson shifted into low gear and drove onto the highway where a collision between the two cars occurred.

November 12, 1941, this action was commenced in the District Court in and for Nez Perce County to recover damages for personal injuries sustained in the collision by the Stallingers, respectively, as well as for damage to the Stallinger car, driven by George Stallinger, Sr., but owned by his son, George Stallinger, Jr.

Answering the Stallinger complaint for damages, respondents specifically denied the allegations of the complaint pertinent to a recovery of damages and then pleaded contributory negligence on the part of the Stallingers. Respondents also filed a cross-complaint for damages against the Stallingers. The jury found for respondent Johnson, thus denying recovery of damages to both appellants and respondents. From the judgment entered on the verdict and an order denying a new trial (sought on the ground of newly discovered evidence), the Stallingers prosecuted an appeal to this court.

Appellants say that:

"This case presents three main questions: first, the insufficiency of the evidence to sustain a verdict and judgment for the respondent and the fact that the verdict and judgment are contrary to law and against the evidence; second, the error on the part of the trial court in the giving and refusing to give of certain instructions; and, third, the error of the trial court in denying a new trial on newly discovered evidence."

These questions will be discussed in the order above stated.

George Stallinger, Sr., testified, in substance, that he was about 400 to 500 feet from the intersection when he first noticed the truck; that the view between the two roads was open; that "Q. At what rate of speed were you traveling at the time when you first saw him (Johnson)? A. Oh, I always go—I never go over 45 miles; 40 or 45 miles; 35; I don't know"; that Johnson did not stop at the "stop" sign before driving on the highway that "Q. How fast were you traveling when you first noticed that he (Johnson) wasn't going to stop? A. Oh, maybe around 40 miles. I don't

know"; that when he first saw the truck it was about the same distance from the intersection he was; that when he first saw Johnson, he, Johnson was traveling about the same speed he was; that he did not see Johnson slow up; that Johnson was over on his, Stallinger's side of the road when the collision occurred; that "Q. But your car hit his (Johnson's car) in the front end. In other words, it was a head-on collision; is that right? A. Yes." "Q. And the impact, the force of your car turned his truck right around, didn't it? A. Yes"; that he was positive the truck was on his (Stallinger's) half of the road; that "Q. * * * Had he (Johnson) completed his left hand turn at that intersection? A. Yes." "Q. Completely? A. Well, by golly, he was completely around, see. I know when he came to the highway he swung around facing right against us."

Mary Stallinger, wife of George Stallinger, Sr., testified that she did not know how far the truck was from the intersection when she first saw it; that "Q. You didn't see it (the truck) while it was on the Webb road then? A. No, it just came out. I just saw him (Johnson) by the 'stop' sign; that's all"; that she did not notice the speed of the truck when she first saw it; that she had never driven a car.

Martha Stallinger testified that she could not say how far the truck was from the intersection when she first saw it; that she couldn't say how fast the truck was traveling when she first saw it; that she had driven a car for six years; that her father was driving slowly; that "Q. Well, now, was it (the truck) going slow or was it going fast? A. Oh, I think about a medium speed." "Q. And what would you call a medium speed? A. Oh, about forty or fifty miles." "Q. And would you say that your car was going as fast as the truck when you first saw the truck? A. You mean as fast as our car? Q. Yes? A. I don't know"; that the truck did not slow down as it entered the intersection.

Frieda Stallinger testified that she could not say how far the truck was from the intersection when she first saw it; that "Q. Now, what happened when you reached the intersection of Webb road with highway 95? A. Well, this pick-up was driving along at an average speed, as we were, and it did not stop at the 'stop' sign"; that "Q. And do you remember where the crash took place with reference to the

intersection? A. You mean on the road?" "Q. Yes. A. No, I couldn't." "Q. Whether it was in the center of the road or the right portion or left portion? A. I couldn't say."

Muriel Bateman, called by appellants, testified that she followed the Stallinger car from Lewiston; that she was driving between forty and forty-five miles an hour; that she stopped at Lapwai for about seven minutes; that she then continued on Highway 95; that she "Just came in sight of them (the Stallingers) again at Sweetwater bridge"; that she saw the cars "just as they came together"; that she was driving at about the same rate of speed when she overtook them the first time; that Johnson did not stop at the "stop" sign.

C. C. Bennett, called by appellants, testified the Stallinger car "had a governor on it set at fifty miles an hour at the time of the wreck."

M. E. Pierstorff, Deputy Sheriff of Nez Perce County, called by appellants, testified he was called to the scene of the accident, arriving there about 5:45; that he examined highway 95 at the point of impact of the Stallinger car against the truck; that the point of impact was about eighteen inches east of the yellow line (Stallinger's left hand and Johnson's right hand side of the highway); that he determined that by the car track marks; that the rubber burn on the highway led up to the point of impact; that the rubber burn involved all four truck wheels; that in a distance of thirty feet the Stallinger car "swerved to the left enough so that the right front tire was eighteen inches to the left of the yellow line, going towards Culdesac"; that he measured the distance with a steel tape; that the Stallinger car struck the left front wheel, fender, headlight and bumper of the truck.

Respondent L. C. Johnson testified he was driving slowly as he approached the highway (95) to Sweetwater; that he "slowed right down to a very slow speed, I should say around five or six miles or maybe slower; practically stopped and shifted gears"; that he shifted into common low gear; that the truck had four gears, including "a compound low"; that when he first saw the Stallinger car it was between three hundred and four hundred feet down the highway from Sweetwater; that after shifting into common low gear he drove across the intersection and started down toward Sweetwater; that the truck was not completely straight at

the moment of the collision; that "it was practically straight. I was across the yellow line, but I was still at a little bit of an angle when they struck me"; that the Stallingers "swung right across from their side right into my line and hit me practically in the center, a little bit to the left of center with their right corner of their car"; that the impact "shoved me back approximately thirty feet; turned me around and headed me kind of toward Culdesac"; that after the Stallinger car "tore loose from me it went on up the road approximately, I should say, sixty feet, and landed right along the shoulder of the highway"; that the impact turned the truck around and in doing so left on the highway "marks plainly visible"; that these marks showed the truck "had been pushed back with the wheels skidding, and where they turned me around there was a crease cut in the road by the wheels"; that "they (marks of the wheels of the truck as the truck skidded) were all on the right hand (his own) side going towards Sweetwater"; that there was "a plain, visible line in the center of that highway (95)"; that he didn't come to a full stop; that he came "to a rolling stop"; that to the best of his judgment the Stallinger car at the point of the collision, was traveling about seventy-five miles an hour.

Claire Hart, called by respondents, testified he was at the scene of the accident while there were "still quite a few people there"; that "well, the first sign of the tracks (car tracks on the highway) was—where there had been any rubber sliding at all, was on the right hand (Johnson's) side of the highway headed toward Sweetwater, where it looked like the truck had been shoved back and then across onto the left hand (Stallinger's) side as you headed toward Sweetwater."

James Henry, called by respondents, testified he lived about three hundred yards from the Webb road; that he saw the Stallinger and Johnson cars collide while he was from 35 to 40 yards away; that he saw the Stallinger car when it was about 500 feet from the intersection; that Stallinger was "going along about 70 or 75"; that he was going pretty fast; that when Johnson entered the highway Stallinger was about 300 feet distant; that he didn't see the impact; that he and Deputy Sheriff Pierstorff examined the car tracks on the highway; that "it looked like the wheels (truck) were on the right hand (Johnson's) side of the road (highway) that comes down to Sweetwater"; that Stallinger didn't slow down.

Ward Frost, called by respondents testified on the day of the accident he was hauling a load of wheat to Sweetwater for George S. Riggs; that he was at the scene of the accident about five minutes after the accident occurred; that he stopped and inquired if anyone had been hurt and then drove on to Sweetwater; that on his return trip he stopped and observed, among other things, "the condition of the truck"; that "the frame was sprung and the bumper drove back in, and the radiator was drove back into the motor, and the motor was shoved back almost into the front seat"; that "Q. Now, could you tell where the point of impact was of the Stallinger car into the truck? A. It looked like it was a little bit to the left hand side." "Q. And what do you mean by a little bit to the left hand side? A. Well, right in front. It was a little bit past—a little bit to the left of the middle." "Q. To the left of the middle of the bumper? A. Yes."

Jack Madden, called by respondents, testified he was at the scene of the accident right after it occurred; that he was hauling grain to Sweetwater and was on the Webb road; that he stopped and looked "over the scene of the accident"; that it "just looked like it (the truck) was hit on the front end and shoved back, and shoved plumb around, throwed plumb around"; that the tracks of the truck were on the right (Johnson's) side going to Sweetwater; that that was his impression from observing the car tracks.

To recapitulate: On the question as to where, on highway 95, the collision occurred—whether on Stallinger's right hand side or on Johnson's, George Stallinger, Sr., for instance, testified he was positive the collision occurred on his own "half of the road." On the other hand, Johnson testified that while the truck was not completely straight at the time of the collision, "it was practically straight," across the yellow line; that the Stallingers "swung right across from their side right into my line and hit me practically in the center."

James Hart testified the "first sign" of car tracks on the highway—"where there had been any rubber sliding at all, was on the right hand (Johnson's) side of the highway headed toward Sweetwater"; that "it looked like the wheels (truck) were on the right hand (Johnson's) side of the road (highway) that comes down to Sweetwater."

Ward Frost testified, in substance and effect, the point of impact against the truck was "to the left of the middle of the (truck's) bumper."

Jack Madden testified it "just looked like it (the truck) was hit in the front end and shoved back, and shoved plumb around, throwed plumb around"; that the tracks of the truck were on the right (Johnson's side going to Sweetwater).

Deputy Sheriff Pierstorff (appellants' own witness) testified the point of impact of the Stallinger car against the truck was about eighteen inches east of the yellow line (Stallinger's left hand and Johnson's right hand side of the highway); that he measured the distance with a steel tape; that in a distance of thirty feet the Stallinger car "swerved to the left enough so that the right front tire was eighteen inches left of the yellow line, going towards Culdesac"; that the Stallinger car struck the left front wheel, fender, headlight and bumper of the truck.

We conclude there is no merit in appellants' contention the evidence is insufficient to support the verdict and judgment.

In fact, it appears the most appellants could claim, under the most favorable view that can be taken of the evidence, is that there is a substantial conflict. This court has repeatedly held where there is a substantial conflict in the evidence the verdict will not be disturbed. (*Syster v. Hazzard*, 39 Ida. 580, 229 P. 1110; *Rogers v. Crockett*, 41 Ida. 336, 238 P. 894; *Russell v. Boise Cold Storage Co.*, 43 Ida. 758, 254 P. 797; *Webster v. McCullough*, 45 Ida. 604, 264 P. 384; *Boomer v. Isley*, 49 Ida. 666, 290 P. 405; *Isaak v. Journey*, 52 Ida. 392, 15 P. (2d) 1069; *Intermountain Assn. v. Hallstrom C. Co.*, 53 Ida. 151, 22 P. (2d) 686; *California Jewelry Co. v. McDonald*, 54 Ida. 248, 30 P. (2d) 778; *Carrey v. Secesh Dredging etc. Co., Inc.*, 55 Ida. 136, 39 P. (2d) 772; *Hill v. Wilkinson*, 60 Ida. 243, 90 P. (2d) 696; *Gore v. Richard Allen Mining Co.*, 61 Ida. 622, 105 P. (2d) 735.)

Moreover, whether the Stallinger car was on its right hand side or on its left hand (or wrong) side of highway 95 at the moment of the accident; and whether Stallinger was driving slowly or at an excessive rate of speed were questions for the jury. (*Asumendi v. Ferguson*, 57 Ida. 450, 460, 65 P. (2d) 713; *Evans v. Davidson*, 58 Ida. 600,

615, 77 P. (2d) 661; *Byington v. Horton,* 61 Ida. 389, 401, 102 P. (2d) 652, 657; *Stearns v. Graves,* 62 Ida. 312, 320, 111 P. (2d) 882.)

Furthermore, where the minds of reasonable men might differ, or where different conclusions might be reached by different minds, the question as to the existence of negligence and contributory negligence are questions for the jury. (*Denton v. City of Twin Falls,* 54 Ida. 35, 43, 28 P. (2d) 202; *Call v. City of Burley,* 57 Ida. 58, 69, 62 P. (2d) 101; *Evans v. Davidson,* supra; *Byington v. Horton,* supra; *Stearns v. Graves,* supra.)

Here, as will have been observed, there is very substantial evidence that the Stallinger car struck the truck head-on. Indeed, George Stallinger, Sr., himself, testified, among other things, that "Q. But your car hit it (Johnson's car) in the front end. In other words, it was a head-on collision, is that right? A. Yes." And that "Q. * * * Had he (Johnson) completed his left hand turn at that intersection? A. Yes." From which, and other evidence, the jury would have been fully justified in concluding that all Stallinger had to do to avoid an accident was to drive straight ahead on his own right hand side of the highway, instead of "swerving to the left", and striking the truck head-on on its own right hand side of the highway, as appears from the evidence he did. This court held in *Stearns v. Graves,* supra, (page 324) "that the final cause immediately antecedent to the infliction of the injury is the *proximate* cause of the injury." In the case at bar, as will have been noticed, there is very convincing evidence supporting the proposition that the final cause immediately antecedent to the collision, was the act of George Stallinger, Sr., in swerving from his own right hand side of the highway to his left hand side, which act, therefore, was the *proximate* cause of the accident.

It is conceded the trial court correctly instructed the jury on the law of negligence, contributory negligence and proximate cause, but appellants contend they had the right of way on highway 95 and that the court erred in refusing to instruct the jury, as they requested, in substance, that Johnson's failure to stop at the "stop" sign was such negligence *per se* as would entitle appellants to a verdict, and in instructing the jury (Instruction No. 12) that "the driver of any vehicle traveling at an unlawful speed shall forfeit any right of way which he might other-

wise have," and in further instructing the jury (Instruction No. 19) "that the fact that one has the right-of-way, if such be the fact, does not excuse him from the exercise of ordinary care to avoid causing an accident." The pertinent parts of secs. 39-202, 39-203, 48-504, 48-518 and 48-519, I.C.A., provide:

"[39-202.] Right of way of traffic.—The traffic on such through highways shall have the right of way over the traffic on any other highway, road or street intersecting therewith . . . ."

"[39-203.] Maintenance of signs.—Full stop.—The commissioner of public works shall furnish, erect and maintain suitable standard signs on side roads or streets directing drivers of vehicles approaching a designated through highway to come to a full stop before entering or crossing such through highway, and whenever any such signs have been so erected and maintained it shall be unlawful for the driver of any vehicle to fail to stop in obedience thereto."

"[48-504.] Restrictions as to speed.—a. Any person driving a vehicle on a highway shall drive the same at a careful and prudent speed not greater than is reasonable and proper, having due regard to the traffic, surface and width of the highway and of any other conditions then existing, and no person shall drive any vehicle upon a highway at such a speed as to endanger the life, limb or property of any person.

"b. Subject to the provisions of subdivision a. of this section and except in those instances where a lower speed is specified in this chapter, it shall be prima facie lawful for the driver of a vehicle to drive the same at a speed not exceeding the following, but in any case when such a speed would be unsafe it shall not be lawful.

"1. . . .
"2. . . .
"3. . . .
"4. . . .
"5. . . .
"6. . . .
"7. . . .
"8. Thirty-five miles an hour under all other conditions."

"[48-518.] The driver of any vehicle driving at an unlawful speed shall forfeit any right of way which he might otherwise have hereunder."

"[48-519.] The driver of a vehicle entering upon a state highway from any other highway, private road or drive, shall yield the right of way to all vehicles approaching on any such state highway."

The court instructed the jury in the language (above quoted) of subd. "a" of sec. 48-504, supra. It instructed the jury in harmony with the provisions of subd. "b" of sec. 48-504, supra, that "it shall be prima facie lawful for the driver of a motor vehicle to drive the same at a speed not exceeding 35 miles per hour, but in any case, when such speed would be unsafe, it shall not be lawful." The court also instructed the jury in the language (above quoted) of sec. 48-518, supra, that "the driver of any vehicle traveling at an unlawful speed shall forfeit any right of way which he might otherwise have," and "that the fact that one has the right of way, if such be the fact, does not excuse him from the exercise of ordinary care to avoid causing an accident."

It will be noticed the statute gives the right of way to traffic on through highways that drivers "entering upon a state highway from any other highway, private road or drive" shall yield the right of way to vehicles approaching on any such highway; that where "stop" signs have been erected it is unlawful for a driver approaching a through highway to fail to stop, and that it is unlawful to drive at a speed in excess of thirty-five miles an hour when such speed is unsafe. It will also be observed the statute does not make it any the less unlawful, nor any the less "negligence *per se*," that is to say, negligence in itself, to drive on a through highway in excess of thirty-five miles an hour, when such speed is unsafe, than to fail to stop or to yield the right of way when approaching a through highway from, say, a farm to market road. Furthermore, the trial court followed the statute in instructing the jury that "the driver of any vehicle traveling at an unlawful speed shall forfeit any right of way which he might otherwise have," and in instructing the jury that "any person driving a motor vehicle on a highway shall drive the same at a careful and prudent speed not greater than is reasonable and proper, and having due regard to the traffic, surface and width of the highway and of any other condition then existing, and no person shall drive any vehicle upon a highway at such a speed as to endanger the life, limb or property of any

person," and in further instructing "that the fact that one has the right of way, if such be the fact, does not excuse him from the exercise of ordinary care to avoid causing an accident."

■ There remains for discussion and decision the question as to whether the trial court erred in denying appellants' motion for a new trial. The motion was made upon the ground of newly discovered evidence. It was supported by the affidavits of R. R. Crum and Eugene McDonald. In his affidavit, Crum states he was at the scene of the collision "but a few moments after the wreck"; that in the presence of his son-in-law, Eugene McDonald, he had a conversation with Johnson relative to the collision; that Johnson stated to him that "he had neglected or failed to stop at the stop sign there on Webb road and that the collision was his fault and he was to blame." McDonald, in his affidavit, states he was present at the time the above conversation occurred and that he heard Johnson make the statement so set forth in the Crum affidavit.

The record discloses appellants attempted to impeach respondent Johnson (as provided by sec. 16-1210, I.C.A.) by showing he had theretofore made statements inconsistent with his testimony. In the course of the attempt to impeach, Johnson was interrogated about a conversation he had had with Deputy Sheriff Pierstorff immediately after the accident:

"Q. Now, regarding this conversation with Marion Pierstorff, deputy sheriff, do you recall Mr. Pierstorff asking you if you stopped?

"A. Yes sir.

"Q. And what did you say?

"A. I said I slowed down; I didn't come to a complete stop.

"Q. You didn't say, though, that you did not stop?

The Court: "Well he didn't testify that he said so.

"Q. I will ask you if you made such a statement—that you didn't stop?

"A. I said I come to a rolling stop; a slow stop."

Deputy Sheriff Pierstorff testified, "Well, I asked him (Johnson) if he stopped at the 'stop' sign and he said no he didn't and I asked him if he—he said no he didn't but he slowed down; and I asked him how fast he was going and he said fifteen or sixteen miles an hour."

George Stallinger, Sr., testified he asked Johnson why he didn't stop and that Johnson said "it was my fault. I didn't stop."

Frieda Stallinger testified she was present at the conversation between her father and Johnson; that she asked Johnson "why he didn't stop at that 'stop' sign and he said he didn't know and he said he knew he was at fault; that he should have stopped."

It is at once clear the newly discovered evidence (set out in the Crum and McDonald affidavits) is as fully impeachment in character as the above quoted Pierstorff and Stallinger evidence, and, furthermore, on the question as to whether Johnson, immediately following the accident, made statements inconsistent with his testimony, the newly discovered evidence to the effect that Johnson did not stop at the "stop" sign and that the "collision was his fault and he was to blame," is both cumulative and contradictory. This court held in the early case of *Hall v. Johnson,* 14 Ida. 165, 93 P. 962, that "newly discovered evidence, which is merely cumulative *or* designed to contradict witnesses, is not sufficient to warrant the granting of a new trial." (Emphasis ours.) To the same effect, the recent case of *Livestock Credit Corp. v. Corbett,* 53 Ida. 190, 198, 22 P. (2d) 874.

It follows the judgment must be affirmed and it is so ordered, with costs to respondents.

Ailshie, Givens and Dunlap, JJ., concur.

Budge, J., did not sit at the hearing or participate in the foregoing opinion.