169 P.2d 712

**HUGHES et al. v. HUDELSON.**
No. 7290.

Supreme Court of Idaho.
May 31, 1946.

Rehearing Denied June 26, 1946.

James R. Bothwell, of Twin Falls, and W. B. Bowler, of Boise, for appellants.

R. P. Parry, of Twin Falls, and James, Shaw & James, of Gooding, for respondent.

AILSHIE, Chief Justice.

This is an action for damages brought by Ilene Hughes, appellant, as surviving wife, and as guardian of two surviving children, of Marvin G. Hughes:

Late in the evening of February 22, 1945, respondent, R. W. Hudelson, with Roy Agle, left Gooding to go to Ketchum, in Hudelson's 1940 Chevrolet pickup truck. They were traveling on highway No. 24 from Gooding to Shoshone. About four or five miles east of Gooding, in response to a signal from a pedestrian (later identified as Marvin G. Hughes), respondent stopped his vehicle and consented to Hughes riding in the rear of the truck; he rode as respondent's guest without pay for transportation. A few miles west of Shoshone, at a point where the highway is curved, the pickup truck met two oncoming cars, the lights of the second car not being dimmed. Momentarily blinded by the lights of the cars, respondent drove the truck to his right to allow ample room for the cars to pass. In doing so, the right wheels of the truck went off the road and onto the shoulder of the highway. The shoulder was soft and lower than the pavement. On turning the truck to the left, to return the right wheels to the oiled portion of the highway, the truck went out of control, upset and rolled over several times. Mr. Hughes was thrown from the truck and lay right on the edge of the oiled road, "Right up on the shoulder of the road from where the car was." Mr. Miller and Mr. Neuman came by in the latter's car; they testified that they "got there about 12:30 or a quarter to one or somewhere along in there". Mr. Hughes was placed in Neuman's car and taken to the Gooding County Hospital "around one o'clock or a little after".

The next afternoon, in discussing the accident with respondent (Hudelson), I. G. Hughes, father of Marvin G. Hughes, testified to the following:

"A. Well, I asked him [respondent, Hudelson] how the wreck happened, and he said, 'We was on our way to Hailey, and we saw a hand sticking out like this.' He held out his hand like this. He said, 'We stopped, and he [Marvin Hughes] got in behind in the back end of the car. We just got started up to going good, and we met two cars.' He said, 'We got by the first one all right, but the second one didn't dim his lights.' And he said, 'I was working with this dimming button, and it got off of the road.' He said, 'Well, I kept battling this wheel to get back on, and when it finally come back on the road, why it went out of control, and I rolled over several times.'

"Q. It did what? A. Rolled over several times.

"Q. It did what? A. Rolled over several times.

"Q. Was anything further said there at that time? A. 'Well,' he says, 'I finally, I guess I was stunned or something. When I come to myself I could see a hole in the right hand of the window broken out. While at the same time I could roll down the glass on the left hand side and got out, but I couldn't see that side.' He said, 'I told this man that we would have to get out, because this man in the rear end might be hurt. This man, seemingly, was stunned or something, and I worked him out of the car with my hands.' He said 'After I got out, he couldn't get across.' He said, 'I pushed him across like this with my feet, and after I pushed him across, I come across myself.' He says, 'Your son was laying right on the edge of the pavement on his back.' He says, 'I just stooped down to pick him up, and I saw a car coming, and I hailed the car. I knew the man' he says, 'and we loaded him in and took him to the hospital in Gooding.' I asked him how long it was from the time that they were wrecked until he was in the hospital, and he said he thought it was about 15 minutes.

"Q. Was anything further said at that time, Mr. Hughes? A. I think that was all."

On the morning of February 23d (the day following the accident), F. S. Craig, sheriff of Gooding county, and Sheriff Purdum of Lincoln county, met at the scene of the accident and took some measurements. Sheriff Craig testified:

"We observed where the automobile driven by Mr. Hudelson had been—the right wheels were off the pavement, the oiled pavement, followed down this concurve in an easterly direction and to where it went on the pavement, and the marks from there on down to where the car came to rest. * * * I went as far west as where the car went off the curve with the right wheels, and I paced the distance to where it

showed a mark of turning onto the oil. I stepped that measurement * * *. As I remember 120 paces. * * * I held the tape, the end of the tape, and let Mr. Purdum go out to where the first mark was from where it went onto the oil, from the tire mark on the oil there. Mr. Purdum took the measurement and wrote it on his notebook. I went from that particular mark and went to the next place we marked. He took those measurements. I just held the end of the tape. * * * We made four different measurements as I recall. He put them down, the mark on the pavement from where it started to where it went off. * * * This would be misleading on the diagram as to where he has his indication where north is. It isn't that way on the road. He has 360 feet— * * *. I showed him where the car went off the pavement, as near as I remember. Before I arrived they had stakes there, and I agreed that was approximately correct. I showed him where the first mark was, where the first tire mark was on the pavement where a turn was made after it crossed the inner section of the highway. And I showed him the next one where at the time we visited it it showed a very plain space where we agreed that that was the thing that caused the upset. And I showed him approximately where the mark —the paint off a fender rubbed the oil, and we could all see where the car came to rest.

"Q. That is apparent there now where the car came to rest? A. Yes.

"Q. Now, Mr. Craig, you traced, the next day as I understand it, the morning of the 23rd, the car tracks where the tracks left the oil and ran along on the curve? A. Yes, sir.

"Q. A distance of 120 paces? A. Yes, sir. * * *

"Q. When the car was turned, when the driver turned to get back on the oil, the car went across in a northeasterly direction where it turned as though the driver was trying to pull it back. That tire mark was very plain on the pavement, and we measured—Mr. Purdum did, and I held the tape —where it went on the oil, and he took it over to where that mark of the tire was on the pavement. That was his first measurement. * * * That car went over the center just a little, possibly 2 feet, I think, before it came back on its own side. It showed very distinctly there what had happened. * * * It showed a tire mark on the pavement where it looked as though the tire was turned in this way going into the pavement and probably skidded 3 and a half feet. * * * a mark of red—blue paint and red paint on the pavement * * * The outside paint was blue. The prime coat was red. The blue showed first, and the red near where the car came to rest. * * * There was glass there, small pieces of glass laying there beside the car— where the car had been * * * A. The only time I talked to Mr. Hudelson about the accident was, I believe, the day I served the papers on him. * * *

"Q. Did you make any tests there that day or a day or so after about driving the car along the edge of the road? A. I did come back from Shoshone—coming back from Shoshone to see what would happen if I got over there and went back on the pavement.

"Q. What did you discover? A. I drove my car 30 miles an hour. Somebody was with me, but I don't recall who. I pulled on about the same as the other car would, and I almost became upset. It gave me a good shaking. The pavement set up that much higher than the shoulder. The shoulder was low there at that particular place.

"Q. Did you ask Mr. Hudelson how fast he was driving? A. I did the day I talked to him at the house, yes, sir.

"Q. What did he say? A. He said he thought he might have been going 40 or 45 miles an hour. * * *

"Q. During all that distance of 120 paces, did you see any marks where the brakes had been applied and the wheels had gone deeper into the dirt? A. I can't recall that I did, no, sir.

"Q. It seemed to be about the same? A. It seemed to be along the regular concurve of the curve, yes, sir."

The foregoing facts, with reference to the operation and movement of the car, are fairly corroborated by, and deducible from, appellant's exhibit "C," which shows the *course of the track on the pavement and shoulders,* the measurements taken by the sheriff, and the place where the car came to rest on the south side of the highway.

■ There was no error in admitting plaintiff's exhibit "C"; the correctness of the exhibit was open to inquiry on cross-examination.

The plaintiff, Ilene Hughes, was asked:

"Q. Now, were there any doctor bills or hospital bills incurred in connection with his injury? A. Yes, there were.

"Q. And funeral expenses? A. Yes.

"Q. What were the total of those expenses? A. It was $1,163.00.

"Q. And that—A. That includes everything, I believe. The hospital bill wasn't given to us.

"Q. Who was it given to if you recall? A. When we went to inquire about that, they said it had been turned in to the insurance company, that Mr. Hudelson had his car insured with—"

■ On motion of defendant, the court struck the following part of the answer: "Mr. Hudelson had his car insured with—". This ruling of the court is assigned as error. There was no prejudicial error in the ruling. Wilson v. St. Joe Boom Co., Ltd., 34 Idaho 253, 261, 262, 200 P. 884; Bressan v. Herrick, 35 Idaho 217, 221, 205 P. 555.

Without prejudice to the motion to dismiss, counsel for defendant moved for a nonsuit. Before proceeding with the argu-

ment on defendant's motion for mistrial, counsel for plaintiffs asked permission to reopen the case, to recall appellant and interrogate her in the absence of the jury, which request was granted. Counsel for respondent again moved for a mistrial in the action. Motion for nonsuit was granted and motion for mistrial denied. Judgment of nonsuit was entered and the action was ordered dismissed, from which judgment plaintiffs appeal.

Among appellants' assignments of error are the following: Error in granting defendant's motion for nonsuit; holding, under the facts, that reasonable men might not reasonably draw different inferences as to whether defendant acted with "reckless disregard" of the rights of deceased; holding that plaintiffs were not entitled to the benefit of every inference favorable to them; failing and refusing to view the scene of the accident in company with the jury; sustaining objection of defendant to certain questions propounded and admission of certain exhibits; striking portions of certain testimony; holding and deciding that plaintiffs were required to prove more than ordinary negligence to entitle them to recover in the action; that judgment of nonsuit is against law.

▇ In limine: It is well settled in this state by uniform line of authorities, that our death statute (sec. 5-311, I.C.A.), sometimes referred to as "Lord Campbell's Act", creates a new right of action with a dif-ferent measure of damages from anything known at common law. Whitley v. Spokane, etc., R. Co., 23 Idaho 642, 132 P. 121; Spokane & I. E. R. Co. v. Whitley, 237 U.S. 487, 35 S.Ct. 655, 59 L.Ed. 1060, L.R. A.1915F, 736; Russell v. Cox, 65 Idaho 534, 148 P.2d 221, 222.

"The contention, that our death statute provides a substituted and not a new right of action, is wholly untenable." Russell v. Cox, 65 Idaho 534, 148 P.2d 221, 223, and cases cited.

▇ Our automobile guest statute (sec. 48-901, I.C.A., as amended) fixes the measure of proof necessary for recovery under that statute for injury to or death of guest passenger who was, at the time of the accident, being transported without payment for such transportation. Manion v. Waybright, 59 Idaho 643, 86 P.2d 181; Dawson v. Salt Lake Hardware Co., 64 Idaho 666, 136 P.2d 733. In other words, in a case being prosecuted for the death of another caused by an accident, the usual rule of preponderance of evidence to show negligence prevails; whereas, in a prosecution under the same statute for the death of a *guest* in an automobile, the burden is on the plaintiff to show that the accident was "intentional on the part of the said owner or operator or caused by his * * * intoxication or his reckless disregard of the rights of others." Sec. 48-901, supra, as amended by 1939 Sess.Laws, chap. 160, p. 286.

18

In Russell v. Cox, 65 Idaho 534, 148 P.2d 221, 223, we held:

"The circumstance that, where death results from the wrongful act of another, the injured party may in his lifetime sue for damages or compromise his cause of action for personal injuries, does not in any way militate against the right of the heirs or personal representatives of the decedent to prosecute their independent action for her wrongful death. In other words, the cause of action, which accrued to the injured party during her lifetime, may be prosecuted or compromised by the injured party and the receipts inure to the benefit of her estate; whereas, the right of action, which *accrues on the death* of the injured party, can only be prosecuted by her 'heirs or personal representatives' and does not benefit the estate."

Here the act of negligence, if any existed, consisted of driving an automobile with "reckless disregard of the rights of others." Manion v. Waybright, supra; Dawson v. Salt Lake Hdwe. Co., supra.

In the Dawson case, supra [64 Idaho 666, 136 P.2d 738], the expression, "reckless disregard of the rights of others," was construed and defined in the "Concurring specially" opinion, which was agreed to by three members of the court and constituted the majority opinion in that respect. In course of that concurring opinion (64 Idaho at page 677, 136 P.2d at page 738), the writer said:

"I think a part of Instruction 15 was misleading and probably confusing to the jury and especially the italicized part of the following, which is contrary to my understanding of the words '*reckless disregard* of the rights of others':

" 'In this case there is no claim or contention upon the part of the plaintiffs that Mabel M. Bellville intentionally injured Temple Dawson or that she was intoxicated. You will, therefore, disregard these two elements. The only theory, Gentlemen, upon which you could then return a verdict against Mabel M. Bellville would be because of her reckless disregard of the rights of Temple Dawson. The phrase or term "reckless disregard" as used in the guest statute above quoted means an act destitute of heed or concern for consequences; especially foolishly heedless of danger, headlong, rash; *an act of such conscious indifference to consequences that the jury is justified in saying that the driver wilfully injured his guests. Reckless disregard, wilful disregard and wanton disregard are, gentlemen, equivalent and synonymous terms.*'

"The italicized part of the foregoing quotation from Instruction 15 appears to define the word 'reckless' as the equivalent of 'wilful', 'conscious', or 'wanton.' Of course the word 'reckless' conveys a different meaning when used in connection with some kinds of transactions as distinguished from others. The connection and circumstance under which it is used must

give color and substance to its meaning. Where, however, the word is used with reference to the driver of a guest car, in relation to the guest himself in the car, it can hardly be said that 'reckless' includes *wilful, intentional, or done on purpose*. If so intended, there would have been no reason for retention of the word 'reckless'; nor would the legislature have deleted from the statute the words, 'gross negligence' by the 1939 amendment. (Sec. 48-901, I.C.A., as amended, '39 S.L., chap. 160, p. 286.) It is evident, to my mind, that the legislature by the use of the word 'reckless' following the word 'intentional' meant to hold the driver liable for a lesser degree of negligence than an 'intentional' act. A driver may accomplish the same result, however, by driving in a *manner* or at a *speed* that is dangerous (reckless), and yet do so with no special purpose to injure his guest or himself, or intent other than to be going wherever and however he pleases, regardless of results.

"The word 'reckless,' as used in this statute (sec. 48-901, I.C.A., as amended by chap. 160 of the '39 Sess.Laws), is, in my opinion, not used as synonymous with 'conscious indifference', 'wilful disregard,' or 'wanton disregard' of the rights of a guest."

■ It is a matter within the sound discretion of the trial judge, as to whether or not he will direct the jury to view the premises. See sec. 7-209, I.C.A.; Oregon-Washington R. & N. Co. v. Campbell, 34 Idaho 601, 604, 202 P. 1065; 103 A.L.R. 163, Annotation; MacPherson v. West Coast Transit Co., 94 Cal.App. 463, 271 P. 509; Brown v. Lemon Cove Ditch Co., 36 Cal.App. 94, 171 P. 705, 708; 26 R.C.L., sec. 13, p. 1017.

■ The contention, that error was committed in sustaining objections to certain questions propounded by appellant, is sufficiently answered by the fact, that no offer was made setting out the nature and character of the evidence proposed to be elicited.

■ We have heretofore held that, if testimony is excluded on any theory, the ruling excluding it is not available to appellant as error, in the absence of an offer of proof which shows it should have been received on some other theory. In other words,

"He must state what he proposes to prove by the testimony and that the witness will testify to such facts." Ball v. Stevens, 53 Idaho, 111, 113, 21 P.2d 932; Fite v. French, 52 Idaho 286, 296, 15 P.2d 604; Herring v. Davis, 47 Idaho 211, 273 P. 757.

■ We find no reversible error in the rulings of the court in this case, except as to the sufficiency of the evidence to go to the jury. In that respect, we are satisfied the court was in error as may be seen from the evidence hereinabove quoted. The admission of the respondent,

that he was driving at a 45-mile speed, raises the prima facie presumption of negligence (Sec. 48-504, subd. b, par. 8, I.C.A.; Stallinger v. Johnson, 65 Idaho 101, 139 P.2d 460, 466; Willi v. Schaefer Hitchcock Co., 53 Idaho 367, 373, 25 P.2d 167); and that, coupled with the physical facts, as they are disclosed by the testimony of the sheriff, as to the wheel markings on the oiled pavement and shoulders, and other physical facts disclosed by Exhibit C, constitute sufficient proof to make a prima facie case to put the defendant on his proof. The admissions of defendant and the physical facts, as they are testified to, make a prima facie showing of "reckless" driving, within the meaning of that term as defined in Dawson v. Salt Lake Hardware Co., supra.

Because of the fact that this case must be retried, we refrain from further comment on the evidence.

The judgment is reversed and the cause remanded with direction to grant a new trial. *Costs in favor of appellants.*

GIVENS and MILLER, JJ., concur.

HOLDEN, Justice (concurring specially).

In 1939, S.L.1939, Chap. 160, p. 285, Section 48-901, I.C.A., was amended to provide:

"Liability of Motor Owner to Guest. No person transported by the owner or operator of a motor vehicle as his guest without payment for such transportation shall have a cause for damages against such owner or operator for injuries, death or loss, in case of accident, unless such accident shall have been intentional on the part of the said owner or operator or caused by his * * * *intoxication* or his reckless disregard of the rights of others." (Emphasis in the statute.)

It will be noted the legislature expressly provides no guest "shall have a cause for damages against such owner or operator" of a motor vehicle, "for injuries, death or loss, in case of accident, *unless* such accident shall have been [a] *intentional* [emphasis added] on the part of the said owner or operator, or [b] caused by his * * * *intoxication* [emphasis in the statute], or [c] his *reckless disregard* of the *rights* of *others* [emphasis added]." In the case at bar, it is not either alleged or contended respondent was intoxicated at the time of the accident. Nor do appellants either allege or contend the accident in which Marvin G. Hughes lost his life was "intentional" on the part of respondent. Here a recovery of damages is sought on the ground the accident was caused by respondent's "reckless disregard of the rights" of Marvin G. Hughes.

New Standard Dictionary (Funk & Wagnalls, 1933) defines "reckless": "(1) Destitute of heed or concern for consequences; especially, foolishly heedless of danger; headlong; rash; desperate."

This, undoubtedly, is the sense in which the legislature used the word, as well as the commonly understood meaning of the word. Hence, by the use of the phrase "reckless disregard of the rights of others," the legislature evidently meant, for instance, an act "destitute of heed or concern for consequences." What conduct and circumstances constitute "reckless disregard of the rights of others," is, of course, a question of fact. It in no way involves an interpretation of the statute. The intent of a driver involved in an accident must be determined by his conduct and all the surrounding facts and circumstances. These might, or might not, show a purpose or intent to injure his guest, or the conduct of the driver and the surrounding facts and circumstances might show a "reckless disregard of the rights of others." As held in the foregoing opinion, the conduct of the driver, respondent Hudelson, together with the surrounding facts and circumstances, disclosed by the record, are sufficient to put respondent on his proof. For these reasons, I concur in reversing the judgment and remanding the cause for a new trial.

I am authorized to say Mr. Justice MILLER concurs in this special concurrence.

BUDGE, J., sat at the hearing but expressed no opinion on the case.